Jeffrey I. KAUFMAN, Plaintiff,

v.

PROVIDENT LIFE AND CASUALTY
INSURANCE COMPANY,
Defendant.

Civ. A. No. 91–4339 (AJL).

United States District Court,
D. New Jersey.

June 15, 1992.

Michael R. Chazkel, Chazkel & Bergenfield, East Brunswick, NJ, for plaintiff.

Richard L. McMonigle, Jr., Sara J. McGinnis, McKissock & Hoffman, P.C., Mt. Holly, NJ, for defendant.

## OPINION

LECHNER, District Judge.

This is a breach of contract action brought by plaintiff Jeffrey I. Kaufman ("Kaufman") against defendant Provident Life & Casualty Insurance Company ("Provident"). Jurisdiction appears to be appropriate pursuant to 28 U.S.C. § 1332[1] and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

Provident moves for summary judgment pursuant to Fed.R.Civ.P. 56. It maintains

---

1. Diversity jurisdiction is alleged pursuant to 28 U.S.C. § 1332 *et seq.* Kaufman is a resident of New Jersey. Provident is a Tennessee corporation. The amount in controversy is alleged to exceed fifty thousand dollars. Complaint, filed 30 September 1991, (the "Complaint"), ¶ 1.

there are no genuine issues of material fact.[2] For the reasons stated below, summary judgment is granted.

*Facts*

*Employment and Business Background*

Kaufman, born 1 May 1945, is forty-seven years old. Kaufman Appendix, Exhibit A ("Kaufman Dep.") at 6. He resides in Englewood, New Jersey. Complaint, ¶ 1. In 1980 Kaufman and Dr. Robert C. Morstein ("Morstein") formed two companies, Eyexam 21, P.A. ("Eyexam 21") and Contact Lens 21 ("Lens 21"). Kaufman 12(G) Statement, ¶ 7. Kaufman and Morstein are both officers and fifty percent owners of the companies. *Id.*

Kaufman's and Morstein's first Eyexam 21 store is located on Route 4 in Paramus, New Jersey. Kaufman Dep. at 17. Eyexam 21 leases space from Eyelab ("Eyelab"), a vision superstore owned by Robert Hillman and Larry Kohan. Kaufman 12(G) Statement, ¶¶ 8, 10. Eyexam 21 was Eyelab's exclusive agent. Kaufman Dep. at 21. Consequently, whenever Eyelab expanded to a new location, Eyexam opened a new store. *Id.* As a result of the exclusive agency relationship, Eyexam 21 holds the leases to various Eyelabs. *Id.* In turn, Eyexam 21 subleases space to different optometrists. *Id.* at 22. Since its formation, Eyexam 21 has had stores at twenty-four Eyelab locations. *Id.* at 21.

Lens 21, the second company owned by Kaufman and Morstein, is a buying company. *Id.*, ¶ 9. As a buying company, Lens 21 purchases contact lenses and other contact lens materials. *Id.* It in turn sells these products to Eyexam 21 stores. *Id.* Lens 21 also acts as the staffing company for Eyexam 21 stores. *Id.*, ¶ 11. Lens 21 further maintains the books and records for Eyexam 21 stores and obtains leases for Eyexam 21 stores. *Id.*

Kaufman is the President and Chief Executive Officer ("CEO") of Lens 21. *Id.*, ¶ 12. While in these capacities, Kaufman has duties and responsibilities of reviewing sales figures, reviewing profit and loss statements and dealing with different vendors. Kaufman Dep. at 27, 31. Kaufman calls these functions, management responsibilities. *Id.* at 31.

Before January 1990, Kaufman's management responsibilities also required him to travel about once every three weeks to various facilities. *Id.* at 29. On his visits Kaufman ensured that the optometrist/tenant in that location was one Kaufman wanted, that the optometrist/tenant's stock of lenses was the type Lens 21 desired, that the optometrist/tenant ran his practice in a professional manner and that the optometrist/tenant had a sufficient number of employees to handle the patient flow. *Id.* at 28. Morstein and three other people at Lens 21 assisted in performing these traveling functions. *Id.* When not traveling, Kaufman focused on his other management responsibilities. *Id.* at 31.

In addition to being the President and CEO of Lens 21, Kaufman was an optometrist until April 1991. *Id.* at 33, 129, 131. His practice as an optometrist was centered at the Eyelab located in Paramus, New Jersey. *Id.* As an optometrist, he saw patients. *Id.* at 33, 35. On average he estimated he practiced optometry twenty-five to thirty hours a week. *Id.* at 33.

---

**2.** In support of this motion, Provident submitted: Defendant, the Provident Life & Casualty Insurance Company's Motion for Summary Judgment (the "Moving Brief"); Defendant the Provident Life & Casualty Insurance Company's Memorandum of Law in Support of Their Motion for Summary Judgment (the "Moving Memorandum"); Defendant, Provident Life & Casualty Insurance Company's Reply Brief in Support of Its Motion for Summary Judgment (the "Reply Brief"); Defendant Provident Life & Casualty Insurance Company's Rule 12(G) Statement of Uncontested and Contested Material Facts in Support of Their Motion for Summary Judgment (the "Movant's 12(G) Statement"); Defendant

Provident Life & Casualty Insurance Company's Supplemental Rule 12(G) Statement in Support of Their Motion for Summary Judgement (the "Movant's 12(G) Supplement"); and Defendant Provident Life & Casualty Insurance Company's Appendix (the "Provident Appendix").

In opposition to this motion, Kaufman submitted: Plaintiff Jeffrey I. Kaufman's Brief in Opposition to Defendant's Motion for Summary Judgment (the "Opposition Brief"); Plaintiff Jeffrey I. Kaufman's 12(G) Statement of Uncontested and Contested Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Kaufman's 12(G) Statement"); and Plaintiff Jeffrey I. Kaufman's Appendix (the "Kaufman Appendix").

*Total Disability Insurance Policy*

On 23 August 1989, Kaufman applied for a total disability income policy with Provident. Kaufman Dep. at 52; Provident Appendix, Ex. C., at 11. Provident is authorized by the Department of Insurance of the State of New Jersey to issue total disability policies. Complaint, ¶ 2. On 21 November 1989, Provident issued to Kaufman a total disability income policy, number 36–335–6017593 (the "Policy"). Kaufman Dep. at 61. Under the terms and conditions of the Policy, Kaufman will receive total disability benefits if he provides proof that his disability occurred when the Policy was in full force and effect, that his disability lasted beyond the one hundred and eighty day elimination period,[3] and that he is totally disabled [4] from his occupation.[5] Movant's 12(G) Statement, ¶ 2. If Kaufman meets these conditions, his benefits accrue for life in the sum of $15,000 per month. *Id.*; Complaint, ¶ 3. At the time Kaufman entered this insurance contract, his occupation was that of President and CEO of Lens 21 and an optometrist.

*Kaufman's Illness*

In January 1990, about a month after receiving the Policy, Kaufman discovered a lump on his neck. Kaufman Dep. at 97; Kaufman 12(G) Statement, ¶ 15. He was initially treated by Gerson Grotberg, M.D. ("Dr. Grotberg"), an internist. *Id.* Dr. Grotberg ordered a sonogram and an x-ray on Kaufman. *Id.* Dr. Grotberg referred Kaufman to Edward Meyers, M.D. ("Dr. Meyers"), an otolaryngologist; Dr. Meyers referred Kaufman to Miguel Sanchez, M.D. ("Dr. Sanchez"), a pathologist at the Englewood Hospital. *Id.* Dr. Sanchez performed a fine needle aspiration on Kaufman. *Id.* After this procedure, Dr. Meyers diagnosed Kaufman as suffering from thyroid cancer and recommended surgery. *Id.*; Movant's 12(G) Statement, ¶ 5. Kaufman consulted with surgeons, Hugh Biller, M.D. and Carl Feind, M.D. ("Dr. Feind") about the recommended surgery. Kaufman 12(G) Statement, ¶ 15.

In February 1990, Dr. Feind performed a partial thyroidectomy and a lymphectomy on Kaufman. *Id.* The surgery was performed at Columbia Presbyterian Hospital in New York City. *Id.* The morning after the surgery, Dr. Feind told Kaufman the lump was not malignant. *Id.* To compensate for the partial loss of the thyroid, Kaufman had to take the artificial thyroid medication, Synthyroid. *Id.* At the two week post-operative check up, Dr. Feind told Kaufman the lump was malignant and was comprised of two types of cancers, follicular and papillary carcinomas. *Id.*, ¶ 16. These cancers had metastasized at least to his first lymph node. *Id.*

Dr. Feind recommended further medical treatment to address the problem. The treatment he recommended involved a radiation ablation [6] and the oral ingestion of radioactive tablets which, when absorbed into the body, destroy the cancerous cells. *Id.*, ¶ 17; Movant's 12(G) Statement, ¶ 8.

3. Under the Policy, elimination period is defined as follows:

    **Elimination Period** means the number of days of disability that must elapse in a period of disability before benefits become payable. The number of days is [one hundred and eighty]. These days need not be consecutive; they can be accumulated during a period of disability to satisfy an [e]limination [p]eriod. Benefits are not payable, nor do they accrue, during an [e]limination [p]eriod.
    Movant's 12(G) Statement, ¶ 4; Movant's Appendix, Ex., C, at 4.

4. Under the Policy total disability is defined as follows:
    **Total Disability or Totally Disabled** means that due to Injuries or Sickness:
    1. you are not able to perform the substantial and material duties of your occupation; and

    2. you are receiving care by a Physician which is appropriate for the condition causing the disability.
    Movant's 12(G) Statement, ¶ 4.

5. Under the Policy occupation is defined as follows:

    **Your Occupation** means the occupation (or occupations, if more than one) in which your are regularly engaged at the time you become disabled.
    Movant's 12(G) Statement, ¶ 4; Movant's Appendix, Ex., C, at 4.

6. Dr. Feind told Kaufman, if he were to pursue this procedure he would have to, for the two days following *ingestion of the tablets,* "flush[ ] to the toilet twice after" any use. Kaufman 12(G) Statement, ¶ 17.

Kaufman, hesitant to consume the radioactive tablets, sought a second opinion. *Id.* The second opinion was obtained from Nicholas Gonzales, M.D. ("Dr. Gonzales"). *Id.,* ¶ 15. Dr. Gonzales recommended a nutritional cancer therapy program. *Id.,* ¶¶ 19, 21. Kaufman pursued the therapy program suggested by Dr. Gonzales.[7]

Since March 1990, Kaufman has been under the care of Dr. Gonzales and has participated in his cancer therapy program. Kaufman 12(G) Statement, ¶ 19. In conjunction with the cancer therapy program, Dr. Gonzales placed physical restrictions on Kaufman. *Id.,* ¶ 21. After following this program for two years, Kaufman's prognosis is good and he feels well. *Id.,* ¶ 19; Kaufman Dep. at 124, 126.

*Kaufman's Alleged Disability*

On or about 1 October 1990, Kaufman communicated with his insurance agent, David Farber, who in turn notified Provident of Kaufman's intention to file a claim for total disability benefits. Kaufman 12(G) Statement, ¶ 26. Kaufman alleges he became totally disabled from his occupation on 1 October 1990. Movant's 12(G) Supplement, ¶ 10.

On 17 January 1991, Kaufman filed with Provident a notice of claim (the "Notice of Claim"). In the Notice of Claim, Kaufman set forth his job description, his statement of claim and a statement of his attending physician. Kaufman 12(G) Statement, ¶ 27; Movant's 12(G) Statement, ¶ 13. The Notice of Claim Kaufman submitted was signed and dated 19 October 1990. Kaufman Appendix, Ex. D at 1, 3. In the Notice of Claim Kaufman described his job title as President. *Id.* at 2. He further described his duties and responsibilities as "those normally associated with President [and] CEO." *Id.* He further described his duties as involving traveling between stores, determining budgets, determining expenditures and supervising staff.

*Id.* at 4. In the Notice of Claim, Kaufman further indicated that his job involved being an optometrist. *Id.*

On 1 May 1991, Kaufman filed with Provident a supplemental statement of claim (the "Supplemental Statement"). The Supplemental Statement further described the alleged total disability. Kaufman 12(G) Statement, ¶ 28. In the Supplemental Statement, Kaufman described how his time was occupied between October 1990 and March 1991. He stated: "A majority of my time is occupied with my cancer treatment program. The cancer program is quite rigorous, involved [and] time consuming. I also do mild exercise and I am in psychotherapy to help me with my cancer." Kaufman Appendix, Ex. E. He stated he managed to go to his business on a limited basis. *Id.* He was able to practice optometry and examine eyes three to six hours a week. *Id.* Travel between various stores was, however, eliminated. *Id.*

By letter, dated 2 May 1991, Provident rejected Kaufman's claim for total disability benefits.[8] Provident stated: "Based upon our review it does not appear that at this time you are eligible for Total Disability benefits according to the terms of the policy." Kaufman 12(G) Statement, ¶ 29; Kaufman Appendix, Ex. F.

According to Provident, Kaufman failed to show he was "not able to perform the substantial and material duties of [his] occupation." Kaufman 12(G) Statement, ¶ 33. Provident based this determination on the facts that Kaufman was still going to work, running his business and performing substantial and material duties of his occupation. *Id.,* ¶¶ 35, 41, 45. Provident did not analyze these facts by a written formula. Kaufman Appendix, Ex. B., Deposition of Germaine ("Germaine Dep.") at 43. Its determination

---

**7.** Dr. Gonzales' program has the following three elements:

> [F]irst, [Kaufman] follows an organic diet which has been tailored to fit his metabolic needs; second, he takes mineral and vitamin supplements at various times of the day; and third he partakes in periodic body detoxification, which include "liver flushes" and other flushes of the digestive system. This nutrition-

al program also includes … daily "coffee enemas."

Movant's 12(G) Statement, ¶ 10 (citing Movant's Appendix, Ex., Deposition of Kaufman ("Kaufman Dep.") at 105, 110).

**8.** Mark Germaine ("Germaine"), Provident's New York City field claim representative, wrote the letter rejecting Kaufman's claim.

was not made pursuant to a strict income test or a strict time test. Germaine Dep. at 77, 78. This judgment was based upon the facts submitted in the Notice of Claim and the Supplemental Statement. *Id.* at 124.

Despite Provident's conclusion, Kaufman alleges he became totally disabled in October 1990. Complaint, ¶ 4. Kaufman alleges he complied with the terms and conditions of the Policy. Complaint, ¶ 5. He alleges he described his disability in the Notice of Claim and Supplemental Statement. *Id.* He alleges he submitted medical documentation in support of his disability. He further alleges he satisfied the one hundred and eighty day elimination period. *Id.*

Kaufman maintains Provident based its determination on inaccurate facts. Kaufman asserts he answered one question in the Notice of Claim inaccurately. Kaufman maintains he described his occupational duties and responsibilities as "those normally associated with the office of President & CEO." Movant's Appendix, Ex. D. He asserts this description is inaccurate because it allegedly reflects his occupational duties and responsibilities as of October 1990. Movant's Appendix, Ex. G, ¶ 11; Kaufman 12(G) Statement, ¶ 43. Kaufman asserts he failed to mention he also had duties and responsibilities as a doctor of optometry.

At his deposition, Kaufman attempted to correct what he labels an inaccurate description. Movant's Appendix, Ex. G, ¶ 12. He stated his occupation involved being the President and CEO of Lens 21 and an optometrist for Lens 21. *Id.* Furthermore, he delineated the hours he worked in his capacities as President[9] and CEO and as an optometrist. He stated that as President and CEO he worked, before his illness, from nine or nine-thirty to three or three-thirty in the afternoon. Kaufman Dep. at 148. As well at this time, in his optometry job, he worked from three-thirty to nine-thirty in the evening. *Id.*

Kaufman further delineated the hours he worked at his occupation after the operation and during the initial period of Dr. Gonzales'

therapy program. He worked as President and CEO from approximately ten or tenthirty in the morning until one or one-thirty in the afternoon. *Id.* at 148–149.. Thereafter, he would go home for a few hours and then work as an optometrist a couple of nights a week. *Id.*

Presently, he no longer provides optometric services. *Id.* However, he continues to work as President and CEO from ten or tenthirty in the morning until one or one-thirty in the afternoon four or five days a week. *Id.* At his deposition Kaufman testified about his present occupation as follows:

Q. Are you still the chief executive officer of Contact Lens 21?

A. Yes, sir.

Q. Are you still chief executive officer of the number of Eyelabs that you were before?

A. Yes, sir. . . . .

Kaufman Dep. at 133.

Q. Has there been a change in the duties which you perform on behalf of Contact Lens 21 or Eyexam 21 since your diagnosis of thyroid cancer?

A. A little. The amount of time that I'm at work is reduced so that my availability has been affected, not my ability or affability. . . .

*Id.* at 127.

Q. So, as things stand now [as of 1 May 1991], you did not go in to the various facilities and perform optometric services; is that right?

A. Exactly. . . .

*Id.* at 129.

Q. With respect to the CEO functions, are you still performing those functions . . . ?

A. Yes, usually from 10:30 to 1:30.

Q. And during those hours of the day, Monday through Friday, are you still meeting with the comptroller as you had before and reviewing documents concerning the various Eyelabs as you had before?

---

**9.** During his deposition, Kaufman described his functions as President and CEO. He used these

terms intermittently; Kaufman Dept. at 26–31.

A. Yes, sir.

*Id.* at 133. Although Kaufman works reduced hours, his ability to work as President and CEO of Lens 21 has not been impaired. *Id.* at 127.

In his Complaint, Kaufman demands a declaration that he is eligible for total disability benefits under the Policy. Complaint, ¶ 8. He also requests payment of his benefits as long as he remains disabled, pre and post judgment interest, costs of suit and attorney's fees.

*Discussion*

Provident moves for summary judgment pursuant to Fed.R.Civ.P. 56. It argues there are no genuine issues of material fact. Moving Brief at 7, 10; Reply Brief at 9–10. Kaufman contends genuine issues of material fact exist. Opp. Brief at 12, 14, 18–20.

A. *Summary Judgment Standard of Review*

■ To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see also Gray v. York Nwspr.,* 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ...: (1) Is there no genuine issue of material fact and (2) is one party entitled to judgement as a matter of law?") (quotations omitted); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Gray,* 957 F.2d at 1078; *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil,* 867 F.2d 179, 182 (3d Cir.1989). " 'Any 'unexplained gaps' in material submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

■ Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported

claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2552 (footnote omitted).

■ Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. see Fed.R.Civ.P. 56(e); *see Gray*, 957 F.2d at 1078, (no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case"); *Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor").

### B. *The Policy*

Kaufman argues the Policy is ambiguous. Opp. Brief at 18–20. On the basis that the ambiguities in the Policy create genuine issues of material fact, he contends summary judgment should be denied. *Id.* at 21. Provident maintains the Policy is not ambiguous. Reply Brief at 7–8.

■ The appropriateness of granting summary judgment depends upon whether the contract terms at issue in this case are questions of contract construction or contract interpretation.[10] *Ingersoll–Rand*, 921 F.2d at 502 (citing *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)); *see also Cury v. Colonial Life Ins. Co.*, 737 F.Supp. 847, 853 (E.D.Pa.1990). The construction of an unambiguous term in a contract is "exclusively with[ ] the court." *Nevets C.M., Inc. v. Nissho Iwai American Corp.*, 726 F.Supp. 525, 531 (D.N.J.1989) (quoting *Gray v. Joseph J. Brunetti Constr. Co.*, 266 F.2d 809, 893 (3d Cir.), *cert. denied*, 361 U.S. 826, 80 S.Ct. 74, 4 L.Ed.2d 69 (1959)), *aff'd*, 899 F.2d 1218 (3d Cir.1990); *accord Ram Constr. Co. v. American States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir.1984) ("When the question is one of 'construction' as distinguished from 'interpretation' of the contract, the issue is one of law."). Construction of contracts is a question of law. *Vanguard Telecommunications Inc. v. Southern New England Tel. Co.*, 900 F.2d 645, 651 (3d Cir.1990); *Nevets*, 726 F.Supp. at 531; *Ram Constr.*, 749 F.2d at 1053.

■ Whether a term is clear or ambiguous is also a question of law. *Nevets*, 726 F.Supp. at 531; *Tigg Corp. v. Dow Corning*

**10.** In a diversity action, the federal courts determine the substantive law to be applied by looking to the choice of law rules of the forum state. *Van Dusen v. Barrack*, 376 U.S. 612, 645–46, 84 S.Ct. 805, 824, 11 L.Ed.2d 945 (1964); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941); *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir.1988). Accordingly, New Jersey choice of law rules will apply.

In contractual disputes, New Jersey follows the Restatement (Second) of Conflict of Laws § 188 (1971) ("Restatement") to determine which state law governs. *Pancza v. Remco Baby, Inc.*, 761 F.Supp. 1164, 1168 (D.N.J.1991) (*citing State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 34, 417 A.2d 488 (1980)). The Restatement standard, known as the "most signifi-

cant relationship" test focuses on the state which has the most significant connections with the transaction and the parties. *Pancza*, 761 F.Supp. at 1168; *see also, Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429 (3d Cir. 1982). Under the Restatement approach, factors involved in the significant relationship test (the domicile of the parties, the place of contracting, the place of performance and the location of the subject matter) are balanced against the reasonable expectations of the contracting parties and the governmental and legislative interests of each interested state. *Pancza*, 761 F.Supp. at 1168; *Simmons*, 84 N.J. at 34, 417 A.2d 488.

In this case, New Jersey appears to have the most significant relationship to the litigation, therefore, reference to the law of New Jersey and the Third Circuit is appropriate.

*Corp.*, 822 F.2d 358, 362 (3d Cir.1987); *Kroblin Refrigerated XPress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986). An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. *Mellon Bank N.A. v. Aetna Business Credit Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980). The interpretation of ambiguous terms in a contract is generally a question of fact. *Nevets*, 726 F.Supp. at 531; *Ram Constr.*, 749 F.2d at 1052.

■ To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their "plain and ordinary meaning." *Armco Inc. v. Glenfed Financial Corp.*, 746 F.Supp. 1249, 1252 (D.N.J.1990) (citing *Nevets*, 726 F.Supp. at 533) (hereinafter *Armco II* ). "Certain terms, however, will be considered in the context in which the agreement was drafted:

> Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a singular nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent."

*Nevets*, 726 F.Supp. at 533 (quoting *Mellon Bank N.A.*, 619 F.2d at 1013). *Cf. Armco Inc. v. Glenfed Financial Corp.*, 720 F.Supp. 1129, 1140 n. 22 (D.N.J.1989).

■ Specific terms of a contract should be analyzed with regard to the meaning of the contract as a whole. "A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." *Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1009 (3d Cir.1982) (New Jersey law) (citing Restatement (Second) of Contracts § 202(2) (1981)); *accord Vanguard*, 900 F.2d at 651, (quoting *Goldberg v. Commercial Union Ins. Co. of N.Y.*, 78 N.J.Super 183, 188, 188 A.2d 188 (1963) (The role of the court is to discern the "general purpose of the agreement, as expressed by the words employed, when read and construed as a whole.")). "A corollary to th[at] principle is that an ambiguous subsidiary contractual provision must be given an interpretation consistent with the dominant purpose of the contract." *Barco*, 674 F.2d at 1009.

It is also important to note the role of common sense in the construction of contracts:

> The construction of a written instrument "to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical [people] to accomplish an honest and straightforward end."

*Armco II*, 746 F.Supp. at 1253 (citing *Krosnowski v. Krosnowski*, 22 N.J. 376, 387, 126 A.2d 182 (1956) (quoting *Clark v. State St. Trust Co.*, 270 Mass. 140, 169 N.E. 897 (1930))).

■ Generally under New Jersey law, insurance contracts are interpreted liberally and in favor of the insured. *United States Fidelity & Guaranty Co. v. Greater Essex Sec., Inc.*, 248 N.J.Super. 105, 115, 590 A.2d 262 (1991); *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 336, 495 A.2d 406 (1985); *Bowler v. Fidelity & Cas. Co.*, 53 N.J. 313, 321, 250 A.2d 580 (1969). However, when making the determination as to whether an ambiguity exists in an insurance contract, "[t]he language of the policy may not be tortured ... to create ambiguities where none exist." *St. Paul Fire and Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir.1991) (quoting *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 761 (3d Cir.1985)). Kaufman argues the terms "occupation" and "elimination period" are ambiguous. Opp. Brief at 20.

In pertinent part, the term "occupation" means the occupation or occupations, if more than one, in which the claimant is regularly engaged in at the time the claimant becomes disabled. Movant's Appendix, Ex. D at 4. Kaufman contends this term is ambiguous because of the word disabled. Opp. Brief at 20. Kaufman argues it is unclear whether a claimant's occupation is defined at the time a claimant becomes partially or totally disabled. *Id.* "The occupation to which [total disability] contracts refer ... is ... the occupation which the insured was carrying on at

the time he was insured." *Ohrel v. Continental Cas. Co.,* 138 N.J.Super. 170, 181, 350 A.2d 310 (1975). Accordingly, what is critical is not what the claimant's occupation was at the time he became either totally or partially disabled, it is what his occupation was at the time he was insured. In this case, Kaufman's policy was issued 21 November 1989. At that time Kaufman was the President and CEO of Lens 21 and an optometrist.

■■ In reliance on his contention that the term occupation is ambiguous, Kaufman alleges he described his occupational duties in the Notice of Claim inaccurately. Opp. Brief at 19. He described them as of October 1990, when he should have described them as of the date he was insured, 21 November 1989. *Id.;* Kaufman Appendix, Ex. G, ¶ 11. The fact that Kaufman described his occupation in the Notice of Claim inaccurately is not a sufficient reason to deem the Policy ambiguous. This argument fails to raise a genuine issue of material fact.

Kaufman further argues the Policy is ambiguous because of the term "elimination period." Opp. Brief at 19. In pertinent part the term elimination period means: "the number of days of disability that must elapse in a period of disability before benefits become payable." Movant's Appendix, Ex. D at 4. Kaufman maintains his interpretation of this term "should not result in [Kaufman] being denied coverage." Opp, Brief at 21. However, Kaufman was not denied coverage on this basis. Kaufman was denied coverage because Provident determined he was not totally disabled. Germaine Dep. at 35, 69.

## C. *Total Occupational Disability*

Kaufman argues there is a genuine issue of material fact regarding what were the substantial and material duties of his occupation and whether he can perform the substantial and material duties of his occupation. Opp. Brief at 12, 15. On these bases, he contends summary judgment should be denied.

■■ The Policy issued to Kaufman is an occupational total disability policy. Occupational disability policies provide benefits where the claimant is unable to perform his normal job. *Dittmar v. Continental Cas.*

*Co.,* 29 N.J. 532, 150 A.2d 666 (1959); *accord Vanderklok v. Provident Life and Acc. Ins. Co.,* 956 F.2d 610, 614 (6th Cir.1992); *DeWitt v. State Farm Ins. Cos. Retirement Plan for United States Employees,* 905 F.2d 798, 802 (4th Cir.1990). As mentioned, "[t]he occupation to which such contracts refer in promising indemnity when the insured is unable to carry on an occupation refers to the occupation which the insured was carrying on at the time he was insured." *Ohrel,* 138 N.J.Super. at 181, 350 A.2d 310. The *Ohrel* court stated:

> Courts throughout the country have been virtually unanimous in holding that under an occupational disability provision, the insured is totally disabled when ever he is incapacitated from performing the duties of his particular occupation.

*Ohrel* 138 N.J.Super. at 180, 350 A.2d 310.

■■ Under New Jersey law, to be totally disabled a person does not have to be bedridden, incapacitated, paralyzed or completely unable to function. *Bowler,* 53 N.J. at 322, 250 A.2d 580 (citing *Nickolopulos v. Equitable Life Assurance Soc.,* 113 N.J.L. 450, 452, 174 A. 759 (E & A 1934); *Fannick v. Metropolitan Life Ins. Co.,* 34 N.J.Super. 556, 113 A.2d 28 (App.Div.1955); *Peterson v. Hartford Accident & Indem. Co.,* 32 N.J.Super. 23, 107 A.2d 668 (App.Div.1954)); *accord Vanderklok,* 956 F.2d at 615; *Brasher v. Prudential Ins. Co.,* 771 F.Supp. 280, 283 (W.D.Ark. 1991) (total disability does not require claimant to be unconscious); *Price v. State,* 757 P.2d 839 (Okla.1988) (total disability does not require absolute helplessness); *Colonial Life & Acci. Ins. Co. v. Whitley,* 10 Ark.App. 304, 664 S.W.2d 488 (1984) (total disability does not require helplessness).

■■ If the insured is unable to perform the material duties pertaining to his occupation, then the insured is totally disabled. *Ohrel,* 138 N.J.Super. at 181, 350 A.2d 310; *see also Bowler,* 53 N.J. at 322, 250 A.2d 580 (citing *Feldmann v. Metropolitan Life Ins. Co.,* 14 N.Y.S.2d 652 (App.Div.1939)). The mere fact that the insured can engage in inconsequential or trifling work which yields a negligible emolument will not disqualify him from total disability. *Bowler,* 53 N.J. at 322, 250 A.2d 580 (citing *John Hancock Mut.*

*Life Ins. Co. v. Schroder*, 235 Ala. 655, 180 So. 327 (1938); *Rickey v. New York Life Ins. Co.*, 229 Mo.App. 1226, 71 S.W.2d 88 (1934)). Nor will temporary or intermittent work disqualify a claimant. *Id.* However, gainful work in the claimant's occupation will. *Bowler*, 53 N.J. at 323, 250 A.2d 580. The disqualifying work must be maintained with reasonable and substantial continuity and regularity in order to disqualify a claimant. *Ohrel*, 138 N.J.Super. at 181, 350 A.2d 310; *see also Bowler*, 53 N.J. at 323, 250 A.2d 580.

The claimant may further be disqualified from total disability status by working in his occupation where the work maintained is profitable or advantageous. *Bowler*, 53 N.J. at 322, 250 A.2d 580. The financial reward from such work must be substantial and not a mere nominal gain or profit. *Id.* (citing *Mut. Life Ins. Co. v. Bryant*, 296 Ky. 815, 177 S.W.2d 588 (Ct.App.1943); *Zakon v. Metropolitan Life Ins. Co.*, 328 Mass. 486, 104 N.E.2d 603 (1952); *Aetna Life Ins. Co. v. Motheral*, 183 S.W.2d 677 (Tex.Civ. App.1944)). A claimant's earnings from temporary work must approach a dignified level before that income is considered as a factor barring a claim for total disability. *Bowler*, 53 N.J. at 323, 250 A.2d 580 (citing *Erreca v. Western States Life Ins. Co.*, 19 Cal.2d 388, 121 P.2d 689 (1942); *Hughes v. Mut. Life. Ins. Co.*, 180 F.2d 542 (9th Cir.1950)).

In *Bowler*, the plaintiff, trained as a clothing buyer, sought total occupational disability benefits. The plaintiff broke two bones in his right leg. Consequently, he contracted osteomyelitis, an infection that developed at the fractures. The infection caused foul-smelling, seeping surface ulcers. *Id.* 53 N.J. at 319, 250 A.2d 580. The infection further caused the bones in the plaintiff's leg to rot. *Id.* As a result, the plaintiff's leg was held in a brace and he walked with the aid of a cane. *Id.* at 325, 250 A.2d 580. It was determined that "any prospective employer who took 'one look' at his leg would 'certainly refuse to hire him.'" *Id.* at 330, 250 A.2d 580. The plaintiff was unable to work. *Id.* His policy required that the injury "continuously prevents the [i]nsured from performing each and every duty pertaining to his occupation." *Id.* at 318, 250 A.2d 580.

The court found that even though Bowler "had the will to work," he could not "because of his physical incapacity. His disability with its accompanying manifestations—the limp, the cane, the partially unlaced shoe, the bandaged limb,—and his inability even in the eyes of a layman to pass a physical examination, had removed him from the labor market as an employable human being." *Id.* The court held that the plaintiff had in fact been and remained permanently disabled within the meaning of the insurance policy. *Id.* at 337, 250 A.2d 580.

Whether a claimant was totally disabled under an occupational disability policy was considered in *Ditommaso v. The Union Central Life Ins. Co.*, No. 89–6323, 1991 WL 249977, *1, 1991 U.S. Dist. Lexis 17079, *1 (E.D.Pa. 25 Nov. 1991). In *Ditommaso*, a physician's eligibility for total disability benefits was scrutinized. The plaintiff's occupation was that of an osteopathic physician. His occupation involved duties as a physician and a surgeon. The plaintiff injured one of his hands. His injury affected his ability to perform surgery. His duties as a surgeon were eliminated from his occupation.

Ditommaso filed for total disability benefits under his policy. The policy in *Ditommaso* defined total disability as a disability which "continuously prevents the insured from engaging in the regular occupation of the insured at the time disability begins." *Ditommaso*, 1991 WL 249977, *1 1991 U.S. Dist. Lexis 17079, *4. It was determined that to be totally disabled under this provision, the plaintiff's disability must prevent him from engaging in the activities which make up the source of his primary livelihood. The court considered the different duties the plaintiff had as an osteopathic physician. *Id.* at *1, 1991 U.S. Dist. Lexis 17079, at *5.

In making its decision in favor of the insurer, the court considered certain facts significant. It pointed out that even though Ditommaso could no longer engage in surgery, his injury failed to debilitate his abilities as a osteopathic physician. Ditommaso was capable of performing the other duties of his occupation. Also significant was the fact that despite his injury, Ditommaso was able to remain in his occupation in order to earn his

living. *Id.* The court, after considering these factors, found that Ditommaso was not substantially disabled. *Id.* Summary judgment was granted in favor of the insurer. *Id.*

█ In this case, Kaufman argues Provident's motion for summary judgment should be denied because genuine issues of material fact exist regarding what were his occupational duties. Opp. Brief at 12, 13. Kaufman's occupation was President and CEO of Lens 21 and an optometrist for Lens 21. His duties as President and CEO involved "determin[ing] budgets, expenditures, recruiting, supervision of profession [sic] staff and other . . . responsibilities normally associated with the office of President and CEO." Kaufman Appendix, Ex. D at 4. His duties as an optometrist involved seeing patients. *Id.* At his deposition Kaufman stated these were the duties of his occupation.[11] There are no genuine issues of material fact regarding what was his occupation or what his duties were with regard to his occupation.

Kaufman further contends that genuine issues of material fact exist regarding whether he can perform the substantial and material duties of his occupation. Opp. Brief at 12. The Notice of Claim, the Supplemental Statement and Kaufman's deposition testimony demonstrate that Kaufman is able to perform the material duties of his occupation. Kaufman stated in his deposition testimony that his illness affected his ability to perform his occupations duties a "little bit." Kaufman Dep. at 127.

Kaufman concedes that his thyroid disorder does not impair his ability to perform his duties as CEO or President. *Id.* at 128, 136. He also concedes his thyroid disorder did not impair his ability to practice optometry. *Id.* at 128, 136. Kaufman has not lost his ability to perform the substantial and material duties of his occupation even though he no longer practices optometry. Accordingly, there is no genuine issue of material fact

regarding Kaufman's ability to perform the substantial and material duties of his occupation.

Of further significance is that Kaufman has not and does not work in an intermittent or irregular way. *See Bowler,* 53 N.J. at 322, 250 A.2d 580. He works with reasonable and substantial continuity and regularity. *See Ohrel,* 138 N.J.Super. at 181, 350 A.2d 310. Between October 1990 and March 1991, Kaufman performed his duties as President and CEO three or four hours a day, four or five days a week. Kaufman Dep. at 148–149. During the same time period, he also performed his duties as an optometrist a "couple of nights a week." *Id.* It is undisputed that in March 1991 Kaufman reduced the number of hours he worked; however, he continued to run his business on a regular basis and continued to examine eyes as an optometrist. *Id.*

It is further undisputed that in April 1991 Kaufman decided to discontinue his practice of optometry. Kaufman Dep. at 129, 131. It appears his decision to leave his practice of optometry was made not because of his inability to practice. Rather, it was because a person from Provident mentioned to him that he could not recover total disability benefits under the policy if he were "seeing patients." *Id.* at 129–30. As a result, he stopped practicing optometry. Kaufman, however, continues to perform his other duties as President and CEO of Lens 21. *Id.* at 149.

Kaufman, moreover, does not work for "mere nominal gain or profit." *Bowler,* 53 N.J. at 322, 250 A.2d 580. Before 1990, he enjoyed an annual income in excess of one million dollars. Kaufman Dep. at 135. In 1990 he earned over one million dollars. *Id.* In 1991 he earned more than six hundred thousand dollars. *Id.* The four hundred thousand dollar decline in his income, however, was due to independent issues affecting his corporations. *Id.* The decline was not due to his illness.[12] The Policy insures

11. Although Kaufman failed to mention in his Notice of Claim that his occupation involved being the President and CEO of Lens 21 and an optometrist for Lens 21 does not mean that it is in dispute now.

12. At oral argument, Kaufman's attorney argued the income Kaufman earned during the past year was not generated by Kaufman's work as President and CEO of Lens 21. This income, it was argued, was generated from Lens 21's capacity as a landlord. Lens 21, however, is a service

against total loss of capacity to work, not a loss of income. *Ohrel,* 138 N.J.Super. at 181, 350 A.2d 310.

Kaufman has failed to come forward with specific facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e); *see also Gray,* 957 F.2d at 1078.[13] At this juncture no genuine issues of material fact exist. Accordingly, Provident's motion for summary judgment is granted.

*Conclusion*

For the foregoing reasons, the motion of defendant for summary judgment pursuant to Fed.R.Civ.P. 56 is granted.

See also 711 F.Supp. 1244.

company which, among other things, is the leasing agent for Eyexam 21. Kaufman 12(G) Statement ¶ 5. Portions of the income Lens 21 generates are from managing real property and, consequently, so are portions of Kaufman's income.

13. Notably, despite this litigation, the Policy remains intact. Counsel for Provident acknowledged at oral argument that Kaufman may reapply for total disability benefits, if he becomes totally disabled.