**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0847-17T3

B.H.,[1]

    Plaintiff-Respondent,

v.

C.M.,

    Defendant-Appellant.

_____

Argued November 13, 2018 – Decided February 5, 2019

Before Judges Gooden Brown and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FM-13-0094-12.

Bonnie C. Frost argued the cause for appellant (Einhorn, Harris, Ascher, Barbarito & Frost, PC, attorneys; Bonnie C. Frost, of counsel and on the briefs).

Carrie Ayn Smith argued the cause for respondent (Law Offices of O'Toole & Gunteski, LLC, attorneys; Darren

---

[1] We use initials in order to protect the privacy of the parties.

O'Toole and Carrie Ayn Smith, of counsel and on the brief).

PER CURIAM

In this post-judgment matrimonial matter, defendant ex-husband appeals from a September 29, 2017 Family Part order denying his motion to modify child support based on changed circumstances, and holding him in contempt of court for failing to pay alimony and child support as ordered in the parties' final judgment of divorce (FJOD), entered February 16, 2012. For the reasons that follow, we reverse and remand for a plenary hearing concerning the proper interpretation of the parties' matrimonial settlement agreement (MSA), which was incorporated into their FJOD, and for findings of fact on the contempt order.

Under the parties' MSA, plaintiff ex-wife was designated "the primary residential parent," and defendant the "parent of alternate residence[,]" for the parties' two minor children, born in 2008 and 2010. Under Article IV of the MSA, effective February 1, 2012, defendant was required to pay plaintiff child support in the amount of $3500 per month "through the appropriate probation department." Under Article V of the MSA, commencing February 1, 2012, defendant was required to pay for a period of forty-eight months, "limited duration alimony" in the amount of $3500 per month "through the appropriate probation department." Acknowledging that defendant's "cash flow [was]

currently lower than marital levels[,]" in paragraph 5.1 of Article V, the parties agreed that "the enforcement of $3000 of the alimony obligation" would "be temporarily suspended for [six] months[,]" but would "continue to accumulate" in an arrears account.

According to the MSA, the amount and duration of alimony was "irrevocable and non-modifiable" even if "subsequent changes in circumstances" occurred, including defendant's "dramatic and substantial changes in income, of whatever nature, scope[,] or duration[.]" Under paragraph 5.4 of Article V, alimony would terminate prior to "the [forty-eight] payment[s] being made in full" upon "the happening" of certain "events[,]" including the cohabitation or "remarriage of [plaintiff,]" and, "upon the termination of alimony[,]" child support would "be reviewed."

Paragraph 5.9 of Article V of the MSA provided as follows:

> 5.9 <u>INCOME UPON WHICH ALIMONY AND CHILD SUPPORT WAS BASED.</u> The [a]limony provided for herein was premised upon [defendant's] average earned income of approximately $240,000 per year during the last three years of the marriage prior to losing his job in or about October of 2011. Since that time[,] [defendant] has obtained another position and anticipates earning approximately $85,000 per annum. [Plaintiff] is currently unemployed[;] however she agrees to be imputed income of approximately $35[,]000 per annum, so that she can earn at least $35,000 per annum without same triggering a review of

child support. The parties recognize that the child support and alimony set forth in this agreement were agreed to in a non[-]conventional way. Specifically, [defendant] and [plaintiff] agreed that [defendant] would pay child support and alimony totaling $7000 per month for [four] years. The allocation of which shall be equal[]. [Plaintiff] agreed to this settlement to accommodate [defendant]. [Plaintiff] further agreed to delay collection on her alimony obligation, although the arrears will accumulate . . . . Accordingly, if [defendant] seeks to lower his child support obligation within the [three-]year term, the alimony obligation will be retroactively reviewed based upon the [three-]year average income to [defendant] of $240,000 per annum.

Additionally, the parties represented they had "counsel of their own choosing," and entered into the MSA "voluntarily" and not as a "result of any undue influence[.]" They also asserted they "carefully read and fully underst[ood] [the] Agreement in its entirety," and that "the provisions and legal effect of [the] Agreement" were "fair, reasonable, equitable[,] and satisfactory to them."

In August 2017, defendant filed his fourth motion[2] to reduce his child support obligation to $167 per week based on the Child Support Guidelines (Guidelines). Defendant calculated this child support amount utilizing annual

---

[2] Two prior motions were denied without prejudice on October 25, 2013, and January 18, 2017, while the other motion was withdrawn with the hopes of coming to an agreement after mediation.

income for himself of $129,104, representing a three-year average from 2014 to 2016, and imputing income to plaintiff in the amount of $60,000, based on her education and experience. Defendant supplied his current Case Information Statement (CIS), and the prior CIS filed before the FJOD was entered in accordance with Rule 5:5-4(a). In his supporting certification, defendant asserted a modification of child support was permitted under paragraphs 5.4 and 5.9 of the MSA because "[p]laintiff remarried in July 2015 and [his] alimony obligation was terminated on January 1, 2015." According to defendant, under the MSA, "[he] was free to come back within the first three years following the divorce to seek a lower child support number based on [his] current income[,] but that would trigger a review of alimony based on the higher [historical] income" of $240,000 per year. Therefore, at the time, he "chose not to" seek a child support reduction, but now found it "financially necessary" based on a reduction in his actual earned income to "$137,152" in 2014, "$111,780" in 2015, and "$138,380" in 2016.

Defendant certified that despite being "laid off [in October 2011] due to a downturn in the medical device industry[,]" "in order to settle the case," he agreed to be bound by his historical annual income of $240,000, representing salary and commissions, instead of "[having] a trial about [his] good faith

acceptance of a new job earning much less than before." His agreement was a result of certain concessions, specifically, the alimony award being of "limited duration and non-modifiable," and plaintiff's agreement to defer $3000 of the alimony "each month as arrears." However, defendant asserted he had "a significant change of circumstances" based on the fact that "for the past five years," he earned "approximately $100,000 gross less per annum than during the three years immediately preceding the divorce[.]" Nonetheless, according to defendant, he did "not need to show a change of circumstances to obtain a modification" because the "MSA permit[ted] [him] to move for a modification of child support" when "alimony terminate[d]," or "three years after [their] divorce." Defendant asserted further that the MSA "clearly indicate[d] that the $240,000 [would] only be used at the time of modification for the review of alimony, not child support."

To address the "permanency" of his "reduced earnings" and his "good faith efforts in obtaining a job with comparable income" to what he earned "in 2010[,]" defendant certified that he graduated from college in "2001 with a degree in Criminal Justice" and "had no other formal education or training." Towards the end of their marriage, his industry suffered greatly from the impact of the passage of the Affordable Care Act and related healthcare reforms, and

his earnings "were reduced by all potential employers." Accordingly, since October 2011, despite his efforts to find a job paying what he earned before the divorce, he has held five different positions, none of which approached his prior gross earnings, he was laid off three times "due to financial cutbacks," and he did not know what his commissions would be at his current position where he was earning "a base salary of $80,000." Defendant submitted various articles to support his claims.

As to plaintiff, defendant urged the court to consider the fact that she had a college degree in Graphic Design and previously earned $45,000 gross per annum as a Health and Safety Coordinator for the American Red Cross. Based on an annual median wage, as reported by the Department of Labor, of $66,420 as a Graphic Designer, or $59,640 as an Occupational Health and Safety Technician, defendant requested the court to impute an annual salary of "$60,000" to plaintiff, based on "her education and experience."

Plaintiff objected, asserting that defendant had not demonstrated any changed circumstances warranting a reduction. She cross-moved for an order holding defendant in contempt for failing to pay alimony and child support as

A-0847-17T3

ordered in the FJOD,[3] among other relief. In her supporting certification, plaintiff disputed defendant's claim that his salary was reduced as a result of market conditions and averred that "defendant was underemployed" because he "historically earned far in excess of any industry averages." Moreover, plaintiff stated "defendant's lifestyle [had] not decreased" during the relevant time period. Plaintiff also submitted various articles to support her claims.

Additionally, plaintiff submitted her "W-2s from [2014 to 2016,]" and asserted that her "W-2 income," in conjunction with her "minimal income [from her] freelance graphic design work[,]" did not total "anywhere near the $35,000[]" imputed to her in the MSA, "let alone anywhere close to the $60,000[] defendant [was] seeking to impute [to her]." According to plaintiff, upon the termination of alimony, the MSA provision permitted a "review[]" of child support, not "a recalculation[,]" based on the fact that her "income would be significantly reduced" by $3500 per month, and defendant's income would increase proportionally. She affirmed that she made several concessions in the MSA in exchange for "above-guidelines [child] support" and asserted that defendant "misconstrue[d] the purpose" of the MSA provision.

---

[3] Plaintiff asserted that defendant was in arrears $78,663.04 in child support and alimony as of August 29, 2017.

Following oral argument, on September 29, 2017, the trial court issued an order and written decision, denying defendant's motion to modify his child support obligations without prejudice. Acknowledging "[t]he standard for changed circumstances established in [Lepis v. Lepis, 83 N.J. 139 (1980),]" and "further defined . . . in Bencivenga v. Bencivenga, 254 N.J. Super. 328 (App. Div. 1992)[,]" the court concluded that defendant "fail[ed] to establish a significant change of circumstances warranting a modification of child support."

The court explained:

> Defendant has failed to establish that he has conducted a search to find a job that would offer him the same salary that he had before the divorce. Defendant attempts to prove that he has made a good faith attempt to find work with a salary comparable to what he was earning before the divorce. However, [d]efendant does not support his assertion with adequate evidentiary support.
>
> Defendant asserts that the MSA allows for child support to be reviewed upon the modification of alimony. The parties' MSA specifically references [d]efendant's loss of employment and change of income. The language of the MSA is clear, . . . [d]efendant agreed that his imputed income is $240,000 despite anticipating earning significantly less than he did prior to the parties' divorce at the time the parties agreed to the provisions of the MSA. Despite this knowledge, [d]efendant agreed to pay [$3500] per month in child support obligations. In light of the clear anticipation of changed income in the language of the

MSA, [d]efendant has not demonstrated a significant change in circumstances since the time of the divorce.

The court also rejected defendant's request to impute income to plaintiff, stating:

> Defendant requests that . . . [p]laintiff's income be imputed to $60,000. Within the terms of their MSA, [p]laintiff's income has been imputed to $35,000. Plaintiff asserts that she does not and has not met that imputed income since the divorce. At oral argument, [p]laintiff's counsel asserted that, although she went to school for graphic design, she is currently doing minimal amounts of freelance work and has been out of the market since before the children were born. Plaintiff asserts that she is the primary caretaker of the parties' minor children and . . . does not make the income already imputed to her in the terms of the MSA. Therefore, [d]efendant's request to modify child support based on an imputed income of $60,000 is denied.

In the memorializing order, the court also held defendant "in contempt of [c]ourt for his failure to abide by the [FJOD] . . . by his failure to pay alimony and child support," and ordered defendant to "pay $100 per week toward his arrears." However, there were no findings of fact or statement of reasons in the order or placed on the record during oral argument to support that determination. This appeal followed.

On appeal, defendant contends the court misinterpreted the plain language of the MSA provision requiring "a review of child support" upon "the

10

termination of alimony[,]" and improperly applied "the significant change in circumstance standard" to his motion instead of "conduct[ing] a review of child support" as contemplated by the MSA. Defendant asserts "[i]f the court [was] confused as to the interpretation of the language of the MSA, the court should have conducted a plenary hearing to determine its proper interpretation."

Defendant contends "the court also erred when it found defendant did not demonstrate a significant change in circumstances." According to defendant, "he met his prima facie burden to show a change in circumstances" to "at least" warrant "a plenary hearing" where the court could have heard "defendant's testimony with respect to the reasons he was terminated, his job search efforts, and the downturn [in the] medical supply sales field in general." He contends that based on the court's reasoning, "he could continue to pay [$3500/month] in child support ad infinitum."

We begin with an examination of the applicable principles. "When reviewing decisions granting or denying applications to modify child support, we examine whether, given the facts, the trial judge abused his or her discretion." Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012). A trial court's decision in this regard "'will not be disturbed unless it is manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the

11

result of whim or caprice.'" Ibid. (quoting Foust v. Glaser, 340 N.J. Super. 312, 315-16 (App. Div. 2001)). However, we owe no special deference to the trial court's legal conclusions. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Indeed, interpretation and construction of a contract, such as the MSA in this case, is a question of law for the trial court that is subject to de novo review on appeal. Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009) (reviewing the enforcement of a settlement agreement de novo).

New Jersey has long espoused a policy favoring the use of consensual agreements to resolve controversies, and "[s]ettlement of disputes, including matrimonial disputes, is encouraged and highly valued in our system." Quinn v. Quinn, 225 N.J. 34, 44 (2016). "An agreement that resolves a matrimonial dispute is no less a contract than an agreement to resolve a business dispute" and "is governed by basic contract principles." Id. at 45. "Among those principles are that courts should discern and implement the intentions of the parties[,]" and not "rewrite or revise an agreement when the intent of the parties is clear." Ibid. "Thus, when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Ibid. However, "[t]o the extent that there is

12

any ambiguity in the expression of the terms of a settlement agreement, a hearing may be necessary to discern the intent of the parties at the time the agreement was entered and to implement that intent." Ibid. (citing Pacifico v. Pacifico, 190 N.J. 258, 267 (2007)).

A contract is ambiguous if its terms are "susceptible to at least two reasonable alternative interpretations." Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (quoting Kaufman v. Provident Life & Cas. Ins. Co., 828 F. Supp. 275, 283 (D.N.J. 1992), aff'd, 993 F.2d 877 (3d. Cir. 1993)). When a contract is ambiguous in a material respect, the parties must be given the opportunity to illuminate the contract's meaning through the submission of extrinsic evidence. Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 268-70 (2006).

While extrinsic evidence should never be permitted to modify or curtail the terms of an agreement, a court may "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract" in attempting to resolve ambiguities in the document. Id. at 269. As the Court explained in Conway,

> [e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention

of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance.

[Ibid. (alteration in original) (quoting Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301-02 (1953)).]

"When a party to a comprehensive negotiated [MSA] seeks to modify any support obligation, that party must meet the threshold standard of changed circumstances." J.B. v. W.B., 215 N.J. 305, 327 (2013) (citing Lepis, 83 N.J. at 146-48). "Events that qualify as changed circumstances to justify an increase or decrease of support include . . . an increase or decrease in the income of the supporting or supported spouse . . . ." Ibid. (citing Lepis, 83 N.J. at 151). However, "[c]hanged circumstances are not confined to events unknown or unanticipated at the time of the agreement." Ibid. (citing Dolce v. Dolce, 383 N.J. Super. 11, 19 (App. Div. 2006)). "On the other hand, care must be taken not to upset the reasonable expectations of the parties." Ibid. (citing Dolce, 383 N.J. Super. at 19).

"When a [MSA] addresses the changed circumstance, modification of the [MSA] may not be equitable or fair." Ibid. (citing Lepis, 83 N.J. at 153). "The

14

threshold changed circumstances standard assumes that the parties addressed the event precipitating the application to modify provisions of a [MSA]." Ibid.

> In such a situation, the changed circumstances standard does not operate as a threshold barrier to address the motion before the court; the guiding principle for consideration of the motion is the best interests of the child. That same principle informs consideration of a motion to modify a negotiated comprehensive [MSA] once the party seeking modification demonstrates changed circumstances.
>
> [Id. at 327-28.]

Here, defendant's request for modification of the child support obligation required consideration of whether "changed circumstances [had] substantially impaired [his] ability to support himself." Lepis, 83 N.J. at 157. "Determining the impact and magnitude of 'changed circumstances' necessarily entails knowing the starting point before the change, that is, the point from which the change can be measured." Foust, 340 N.J. Super. at 316. Because that consideration was hampered by ambiguities in the operative MSA provisions, we are convinced that a plenary hearing was warranted to discern the intent of the parties at the time the agreement was entered and to implement that intent.

The parties expressed divergent views on the income upon which defendant's child support, rather than his alimony obligation, was based, as well as the meaning of a "review" of child support as contemplated by the MSA.

15

A-0847-17T3

Thus, it was "impossible to know with reasonable accuracy the starting point for measuring an alleged change in circumstances. We consider unreliable by definition a <u>Lepis</u> determination made without accurately knowing the true point of beginning. <u>Lepis</u> does not presuppose an arbitrary or false starting point." <u>Id.</u> at 316-17. Under these circumstances, the court should have conducted a plenary hearing. "[I]n a variety of contexts, courts have opined on the impermissibility of deciding contested issues of fact on the basis of conflicting affidavits or certifications alone." <u>State v. Pyatt</u>, 316 N.J. Super. 46, 50 (App. Div. 1998). In particular, where the parties' certifications raise issues of fact or require credibility determinations, relief cannot be denied absent a plenary hearing. <u>Whitfield v. Whitfield</u>, 315 N.J. Super. 1, 12 (App. Div. 1998).

Here, the parties filed conflicting certifications concerning their intent and interpretation of the MSA as it related to defendant's income for purposes of calculating child support and the meaning of a "review" of the child support award. A plenary hearing was required to resolve these issues. Therefore, we reverse and remand for a plenary hearing to ascertain the parties' intent at the time the MSA was entered, and to implement that intent.

Finally, defendant argues the court erred by finding him "in contempt of court for his failure to pay alimony and child support" when "there was no basis

16

on which to base the finding," particularly since "no alimony obligation existed" and defendant "paid child support via a wage execution." Additionally, according to defendant, there were "[n]o [p]robation statements," "no child support enforcement hearing," and no "credible evidence" that "he was not regularly paying . . . child support."

Whether the nature of the proceeding was one for contempt under Rule 1:10-2, or enforcement of the court's order under Rule 1:10-3, the court failed to make any findings. Rule 1:7-4(a) mandates that a court "shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury, on every motion decided by a written order that is appealable as of right." See Shulas v. Estabrook, 385 N.J. Super. 91, 96 (App. Div. 2006) (requiring an adequate explanation of basis for court's action). As stated by our Supreme Court, the trial court must clearly state "its factual findings and correlate them with the relevant legal conclusions[,]" as "[n]aked conclusions do not satisfy the purpose of [Rule] 1:7-4." Curtis v. Finneran, 83 N.J. 563, 570 (1980). Because "[m]eaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion[,]" Salch v. Salch, 240 N.J. Super. 441, 443 (App.

Div. 1990), the absence of adequate findings "necessitates a reversal," <u>Heinl v. Heinl</u>, 287 N.J. Super. 337, 347 (App. Div. 1996).

In sum, we reverse the court's determinations that are the subject of this appeal, and remand for a plenary hearing to ascertain the parties' intent at the time the MSA was entered and to implement that intent, as well as findings of fact in relation to the court's contempt order. The court shall conduct a case management conference to plan the logistics of the plenary hearing and the possible exchange of any appropriate discovery.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0847-17T3