138 N.J. Super. 170 (1975)
350 A.2d 310
CHARLES W. OHREL, PLAINTIFF,
v.
CONTINENTAL CASUALTY COMPANY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided December 18, 1975.
*172 Mr. Patrick G. Mahoney for plaintiff (Messrs. Mahoney, MacIlwraith & Crovo, attorneys).
*173 Mr. Neil F. Deighan for defendant (Messrs. Kisselman, Deighan, Montano & Summers).
TALBOTT, J.C.C.
In this suit plaintiff seeks to establish his right to a $100 a week payment for the period of his total disability up to lifetime for injuries which he sustained by accident on February 21, 1970 under a blanket disability insurance policy issued by defendant Continental Casualty Company (Continental) to the Gibbsboro Volunteer Fire Co. #1 and the Gibbsboro Ambulance Corps (hereafter Fire Company) for the year 1970. Substantial pretrial discovery and proceedings have ensued since issue was joined by pleadings filed late in 1971 and early 1972. These have included depositions, request for admissions, pretrial conference, as well as motion for summary judgment. The parties now waive their right to a jury trial, have stipulated as to the facts and submit the matter for decision to the court as a matter of law.
The stipulation of facts recites that plaintiff Charles W. Ohrel was born on December 31, 1921. He worked as a union carpenter until February 1965, obtaining work from a carpenter's local union in Philadelphia, Pennsylvania. He earned approximately $550 a month at that time.
In February 1965 plaintiff entered Our Lady of Lourdes Hospital in Camden, New Jersey, with marked osteoarthritis of the left hip. An orthrodesis was performed in which the degenerative portion of plaintiff's left hip joint was removed and the remaining portion fused with metal pins. As a result of this operation plaintiff experienced vascular difficulties and was admitted to John F. Kennedy Memorial Hospital in Stratford, New Jersey, in October 1965, with a condition diagnosed as recurrent pulmonary embolism with pneumonitis. Plaintiff was subsequently admitted to Hahneman Medical College in Philadelphia, Pennsylvania, in January 1966, to undergo a vena cava plication to correct this condition. He never returned to his union work as a carpenter.
*174 From the time of the first operation in 1965 until 1969 plaintiff filed no income tax returns because of his low income. He was deemed totally disabled by the Social Security Administration pursuant to 42 U.S.C.A. § 406 et seq. and began receiving monthly social security disability benefits in mid-1966. He was also deemed totally disabled under the terms of a Prudential Life Insurance policy for purposes of the waiver of premium benefit. The policy contains the following paragraph:
(a) Definition of Total Disability. Total disability means complete incapacity of the Insured resulting from disease or bodily injury, to perform any work or engage in any business or occupation for remuneration or profit; no premium shall be waived which falls due in any period during which the Insured is working or is so engaged * * *.
Plaintiff became a member of the fire company on October 8, 1966. As a fire policeman his duties included directing traffic as well as placing and removing flares on roadways during fire company operations. On other occasions he worked in the fire hall, where he built new cabinets and closets and installed panelling. He was not compensated for any of this work. From October 8, 1966 to February 21, 1970 plaintiff answered 174 of the 191 alarms received by the fire company and attended 124 of the 149 fire company meetings scheduled during the period of January 1, 1967 to 1970.
Defendant Continental issued a blanket health and accident policy, as authorized and defined by N.J.S.A. 17:38-17, to the fire company, Policy No. SR-68015634, effective from January 15, 1970 to January 15, 1971. The statute defines blanket insurance policies as follows:
Any policy or contract of insurance against death or injury resulting from accident or from accidental means which conforms with the description and complies with the requirements contained in one of the following three paragraphs shall be deemed a blanket insurance policy.
(a) A policy or contract issued to any railroad, steamship, motorbus or airplane carrier of passengers, which carrier shall be deemed *175 the policy holder, covering a group defined as all persons who may become such passengers and whereby such passengers shall be insured against loss or damage resulting from death or bodily injury either while, or as a result of, being such passengers.
(b) A policy or contract issued in the name of any volunteer fire department, first aid or ambulance squad or volunteer police organization, which shall be deemed the policyholder, and covering all the members of any such organization against loss from accidents resulting from hazards incidental to duties in connection with such organizations.
(c) A policy or contract issued in the name of any established organization whether incorporated or not, having community recognition and operated for the welfare of the community and not for profit, which shall be deemed the policyholder, and covering all volunteer workers who are members of the organization and who serve without pecuniary compensation against loss from accidents occurring while engaged in the actual performance of duties on behalf of such organizations.
The policy in question is a form policy which is applicable only to volunteer fire companies. It contains benefit provisions which either do, or do not apply, depending upon the coverage chosen and granted, as indicated by the schedule attached to the policy.
Provisions relating to total disability are contained in Benefits D and E. In said schedule the applicable disability of Benefit E, entitled "Total Disability, Weekly Indemnity," was chosen and granted and provides $100 for each week of such disability up to a lifetime maximum. Benefit D provides permanent total disability and does not apply in this case, since it is marked "N/A" on the schedule, which presumably means "not applicable."
Both of these benefits define total disability. Total disability is defined in Benefit D, which was not chosen or granted, as follows:
When as a result of injury and commencing within 30 days of the date of the accident, the Insured is totally and permanently disabled and prevented from engaging in each and every occupation or employment for compensation or profit for which he is reasonably qualified by his education, training or experience, the Company will pay the Permanent Total Disability Indemnity stated in the Schedule, provided such disability has continued for a period equal to *176 the Maximum Period Payable for Total Disability Weekly Indemnity stated in the Schedule for Benefit E, and is total, continuous and permanent at the end of such period.
Benefit E, which is the applicable benefit in this cause of action, defines total disability as follows:
When, as a result of injury commencing within 30 days after the date of the accident, the Insured is totally disabled and continuously prevented from performing each and every duty pertaining to his regular occupation, the Company will pay the amount stated in the Schedule for Benefit E for each week of such disability, but not to exceed the Maximum Period Payable stated in the Schedule for this benefit.
The maximum amount payable stated in the schedule for Benefit E was $100 a week for the maximum period of a lifetime.
The policy defines the term "injury", as it is used under Benefit E, as follows:
Injury as used in this Part means bodily injury caused by an accident occurring while this policy is in force and which results directly and independently of all other causes in loss covered by this policy, provided such injury is sustained by the Insured while actually on duty as an active member of the Fire Company, including injury sustained while going to or returning directly from fires, (whether on a fire truck or otherwise), as fires, drills, parades, or tests or trials of any fire fighting apparatus or any other duty required of active members by the Fire Company.
On February 21, 1970 plaintiff was injured while performing his duties as fire policeman when he was struck by an automobile. Plaintiff sustained a fracture of the distal left femur with displacement, and was admitted to John F. Kennedy Memorial Hospital, Laurel Road, Stratford, New Jersey, on February 21, 1970, where an open reduction of the fracture was performed on February 25, 1970 and metallic pins inserted into the head of the left femur and acetabular rim area. Plaintiff was discharged on March 25, 1970.
*177 As a result of the injury, plaintiff was no longer able to perform his duties as a fire policeman. Defendant paid plaintiff $100 a week for a period of 47 weeks, from February 22, 1970 to January 17, 1971, under Benefit E of the policy in question, for plaintiff's disability resulting from his accident described above. Defendant made no further payments to plaintiff under Benefit E after January 17, 1971 when he discovered that plaintiff had been previously disabled. Thereafter plaintiff instituted this action on September 14, 1971 against defendant to recover the total disability benefits under Benefit E.
On October 7, 1970 plaintiff filed an employee's claim petition for compensation with the Division of Workmen's Compensation, naming the Borough of Gibbsboro and the fire company as respondents. The policy which defendant issued to the fire company did not prohibit plaintiff from filing the petition, specifically providing under its "General Provisions":
This policy is not in lieu of and does not affect any requirements for coverage of Workmen's Compensation Insurance.
Plaintiff subsequently filed a petition for compensation under the Second Injury Fund, and the matters were heard together. Robert W. Page, Judge, Division of Workmen's Compensation, entered a judgment on October 2, 1972 for petitioner, plaintiff herein, against the Borough of Gibbsboro, awarding 27 1/2% of total disability and filing an advisory opinion recommending assessment against the Second Injury Fund for the balance of petitioner's total disability, which opinion was adopted by the Commissioner of Labor and Industry, who entered an order for benefits under the Second Injury Fund on March 25, 1974. Plaintiff's inability to perform any of his duties as a fire policeman and his inability to perform any work, whether for compensation or not, continues to the present date.
Plaintiff now alleges that he is protected by the blanket insurance policy covering the Fire Company to which he belongs and that the injury sustained while performing his *178 duties as a fire policeman rendered him "totally disabled and continuously prevented from performing each and every duty pertaining to his regular occupation" from the time of the accident to the present. He further contends that fire policeman was his occupation and it is not necessary that such occupation be for compensation or profit since that is not a requirement of Benefit E of the policy.
Defendant, on the other hand, contends that plaintiff may not recover under the policy since his regular occupation, if any, was that of a carpenter and at the time of the injury he was already totally disabled from carrying on this occupation by virtue of prior medical problems and operations. At the time of the incident he was receiving social security disability because he was unable to engage in any occupation for remuneration or profit (except the small amount allowable by social security law). Defendant asserts he may not now recover for total disability where he was totally disabled prior to the accident.
The issue before the court is: Can an individual's activity as a volunteer fireman be considered an occupation for purposes of benefit eligibility under a blanket disability insurance policy where that individual has previously been found to be totally disabled from engaging in any gainful occupation?
Insurance policies are contracts, and the intention of the parties governs. 13 Appleman, Insurance Law and Practice, § 7381 at 1 (1943). Caruso v. John Hancock Mut. Life Ins. Co., 136 N.J.L. 597 (E. & A. 1948). The policy issued by Continental in this instance was a blanket policy as required by statute, not an individual or group policy. Ordinarily the subject matter of insurance must be clearly specified so as to make its identification certain. 43 Am. Jur.2d, Insurance, § 323 at 383. Yet, in some cases the nature of the object insured or the circumstances surrounding the issuance of the policy are such as to make it impossible to attain such certainty. Coverage on a changing subject of insurance is provided by blanket policies which, *179 by definition, involve a shifting, fluctuating or varying risk. 44 C.J.S., Insurance, § 48 at 494; Home Ins. Co. v. Baltimore Warehouse Co., 93 U.S. 527, 541, 23 L.Ed. 868 (1876). Originally such policies were designed to cover property, i.e., a changing stock of goods in a plant or factory, or all the goods owned by the insured wherever the location.
In 1939 the New Jersey Legislature authorized blanket disability policies covering individuals rather than property in certain specific circumstances, to wit: passengers in public transportation and volunteers in fire, first aid or ambulance squads, and volunteer policemen. In 1944 volunteer workers for nonprofit charitable organizations were included in N.J.S.A. 17:38-17(c).
An individual policy is one directed to a single individual, his needs, and with knowledge of his specific medical and personal history. Group insurance is a form of insurance whereby a body of persons, usually employees are, in consideration of a flat periodical premium based on average age and paid either by employees in whole or partially by employer and employee, insured in a definite sum as long as the insured remains in such employment and the premiums are paid. Holland v. Lincoln National Life Ins. Co., 45 N.J. Super. 66 (Law Div. 1957), aff'd 46 N.J. Super. 257 (App. Div. 1957).
In blanket disability policies, unlike group or individual policies, the insurer cannot know in advance the number of persons covered, nor can it foresee the physical condition or occupational status of those who are or will become members of the organization insured. Under this policy, in addition to regular members of the fire company and ambulance corps, a rider provides coverage for persons who may be deputized at a fire in an emergency.
Having designed this policy specifically for volunteer fire companies and ambulance corps, Continental must have been or should have been aware of the fact that some volunteers may be persons who do not have employment in the usual *180 labor market. Members of such organizations can and often do include retirees, housewives, students and persons who, due to some disability are unable to remain in the labor market yet can perform a service beneficial to the community. Continental, in issuing a blanket policy as required by N.J.S.A. 17:38-17, must have considered the shifting risk of covering all regular or deputized members of the fire company regardless of their individual backgrounds. The risk is a broad one, and the insurer adjusts his premiums accordingly.
The policy in issue contains two disability clauses. Benefit D, not chosen by the parties, covers total disability, extending benefits only when the insured is "prevented from engaging in each and every occupation or employment for compensation or profit * * *." Benefit E, the one selected by the parties, contains no such limitation as to employment for compensation or profit; payments are to be made when the insured is "prevented from performing each and every duty pertaining to his regular occupation." Benefit D must be deemed a general, or total, disability clause, as distinguished from Benefit E, which insures against specific occupational disability. Courts throughout the country have been virtually unanimous in holding that under an occupational disability provision, the insured is totally disabled whenever he is incapacitated from performing the duties of his particular occupation, as distinguished from other occupations for which the insured may be reasonably suited. Annotation, "Insurance: `Total Disability' or the like as referring to inability to work in usual occupation or in other occupations," 21 A.L.R. 3rd 1155 at 1200 (1968); Dittmar v. Continental Cas. Co., 29 N.J. 532 (1959); Massachusetts Cas. Ins. Co. v. Rief, 227 Md. 324, 176 A.2d 777 (Ct. App. 1962); Canney v. Massachusetts Bonding & Ins. Co., 88 N.H. 325, 189 A. 168 (Sup. Ct. 1937); Garms v. Travelers' Ins. Co., 242 App. Div. 230, 273 N.Y.S. 39 (App. Div. 1934), aff'd 266 N.Y. 446, 195 N.E. 147; Colaluca v. Monarch *181 Life Ins. Co., 101 R.I. 636, 226 A.2d 405 (R.I. Sup. Ct. 1967).
As stated in 1A Appleman, Insurance Law and Practice, § 671 at 600-601 (1965):
The occupation to which such contracts refer in promising indemnity when the insured is unable to carry on an occupation refers to the occupation which the insured was carrying on at the time he was insured. And the rule laid down by almost unanimous authority is this: If the insured is unable to perform his material duties pertaining to his usual and customary occupation in substantially the same manner as before he may recover. If he is able to do substantially all the acts material to his business, and there are only a few immaterial things which he can not do, the rule is otherwise, but if there is any material, important or substantial act which he cannot fulfill, recovery must be allowed.
Defendant contends that the purpose of accident insurance is to reimburse the insured for financial loss sustained by the injury, including compensation for lost earnings. This is not necessarily true under an occupational disability policy. "Ordinarily, disability provisions insure against, not loss of income, but loss of capacity to work." 1A Appleman, supra, § 632 (1965) at 512. The application of this principle is well demonstrated in Niccoli v. Monarch Life Ins. Co., 70 Misc.2d 147, 332 N.Y.S.2d 803 (1972). In that case the New York Supreme Court, Trial Term, held that a physician who specialized in obstetrics and gynecology before he was compelled to give up his practice due to a heart attack could recover under an occupational disability clause which required the insured to suffer "complete inability to engage in his regular occupation", even though plaintiff in that case made more money in his new position as director of family planning and sex education at a local hospital. An occupational disability policy recognizes that an insured can suffer a compensable loss by virtue of his being forced to leave his chosen occupation. Although the loss is psychic, not economic, it is nonetheless a loss.
Did plaintiff have an occupation on the date of the injury?
*182 Defendant insists that in order to constitute an "occupation" there must be remuneration or gain. This court has been unable to find a definition which so limits the meaning of the term.
Webster's Unabridged Dictionary (1968 ed.) states that "occupation" means:
1a: an activity in which one engages: a way of passing the time b: the principal business of one's life: a craft, trade, profession or other means of earning a living.
Black's Law Dictionary (4 ed. 1951) defines the term as follows:
Vocation. That which principally takes up one's time, thought, and energies; especially one's regular business or employment; also, whatever one follows as the means of making a livelihood.
While earnings and livelihood are mentioned, they are not, the primary prerequisite of occupation. An occupation is the way an individual primarily occupies his time: the principal activity of one's life. While an occupation may be followed for the sake of money, it is not essential to do so.
Nor does occupation automatically connote remuneration within the narrow context of insurance law. 7 Couch on Insurance 2d, § 37:328 at 685-686 (1961) states that:
By "occupation" is ordinarily meant the insured's general, regular employment or vocation, as distinguished from a temporary and independent activity or avocation, although the application and meaning to be given the word `occupation', as used in representations, warranties, and conditions in life and accident policies, depend largely upon the particular circumstances of each case, the terms of the contract, the intent of the parties thereto, and the particular purposes or risks insured against, especially where the risks are classified, as well as on whether the statement is regarded as a representation, a warranty, or a condition. [Emphasis supplied]
Defendant cites the case of Jantausch v. Verona, 41 N.J. Super. 89 (Law Div. 1956), for the purpose of showing that *183 New Jersey associates the word "occupation" with gainful remuneration. However, this was a zoning case in which plaintiff sought to uphold the issuance of a building permit allowing the construction of a beauty salon in plaintiff's home in the face of a zoning ordinance allowing only home occupations. In construing the term the court noted (at 97) that "The word `occupation' is most comprehensive. It may embrace all gainful activities * * *" This inconclusive dictum, taken from an entirely different contextual setting, sheds faint light on the present problem.
The same can be said for defendant's citation to Shuman v. National Cas. Co., 80 N.J. Super. 310 (Law Div. 1963). In that case plaintiff sought to recover on a total disability policy which stated that benefits would be paid if the insured "shall be wholly and continuously disabled from engaging in any gainful occupation." As the court noted (at 316), a different factual and legal pattern is projected if a policy is occupational.
Appleman is quite specific on this issue. In discussing occupational disability insurance he states that "the mere fact that the insured is active in something not constituting a vocation for profit cannot be set up by the insurer to defeat liability." 1A, Appleman, Insurance Law and Practice, § 674 at 624-625 (1965).
New Jersey courts have traditionally given insurance policies a liberal construction in favor of the insured. In Bowler v. Fidelity & Cas. Co., 53 N.J. 313, the Supreme Court, in discussing the obligations of such companies, stated:
Corporations franchised to sell life and accident and health insurance policies to the public enjoy many privileges, advantages and protections not commonly available. Their favored position requires the assumption of a stern obligation toward people who purchase their contracts. Simply described the obligation is that of fair dealing. Insurance policies are unipartite in nature. They are prepared by the company's experts, men learned in the law of insurance who serve its interests in exercising their art of draftmanship. The resulting document with its many clauses is given to the insured in *184 printed form upon the payment of a premium. There is no arm's length bargaining such as characterizes negotiations between equals in the marketplace. Consequently courts in their quest for justice for the insured, universally give him the benefit of any construction of the language which can be said fairly to represent the protection extended to him. [Citing other cases]
Given this rule of construction, could this court fairly find the parties to this contract to have intended that only those disabled from a regular occupation involving remuneration or profit be compensated? We think not. In the circumstance presented by this case, the intent seems rather to protect all individuals in the class. It is possible that some members may be partially employed earning $20, $40 or $60 a week. Does the amount of compensation earned determine eligibility for $100 a week as specified in the policy? If not, where is the line drawn? The policy pays a fixed amount of $100 a week for total disability. There is no reduction if you earn less at your "regular occupation" nor does it pay you more if you make ten times as much. The policy does not attempt to reimburse the member for his loss of income. For such an unknown and shifting group such an approach would not be feasible. It is unreasonable to believe that it was contemplated that some of those covered by the terms of the policy were meant to recover for injuries suffered while serving their community while others were not because they engaged in no occupation for compensation or profit. If, as the insurer argues, "occupation" means "for compensation or profit," then it was not necessary to put this language in Benefit D. But in modifying occupation or employment for "compensation or profit" in Benefit E, and the omitting that modification when it refers to "his regular occupation" in Benefit E, the insurer creates the obvious inference that the "occupation" referred to in Benefit E was not limited to "for compensation or profit." If the insurer had intended otherwise, it could have easily added those words to "his regular occupation." The court cannot read "gain or profit" into Benefit E.
*185 Contrary to the position pressed by defendant, the court does not consider plaintiff's work trifling and unimportant. The Legislature, in including volunteer firemen within the workmen's compensation statutes, has indicated that it deems the work of these unpaid public servants to be as significant as that performed by their regularly compensated brethren. N.J.S.A. 34:15-74 places volunteer firemen on the same footing as a paid fireman insofar as workmen's compensation is concerned. Snoden v. Watchung, 29 N.J. Super. 41 (App. Div. 1953), aff'd 15 N.J. 376 (1954). The statute was designed to afford a measure of protection against voluntary occupational hazards to those who out of a sense of public duty assumed the risk of fire or safety service. Volek v. Deal, 83 N.J. Super. 58 (App. Div. 1964).
Obviously, the parties intended that, for a premium, these unpaid public servants would receive a fixed weekly benefit for the duration of a totally disabling injury sustained in this hazardous work, regardless of what they earn. Return to any of the duties of their regular occupation is a test of the termination of the total disability.
Defendant's contention that plaintiff cannot recover because of prior findings of total disability in the context of the coverage afforded plaintiff under Benefit E of this policy cannot prevail. The Social Security Administration awarded benefits on the basis of plaintiff's "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment * * *" 42 U.S.C.A. § 416(i) (1) (emphasis supplied) After his 1965 operation plaintiff did not return to work as a union carpenter but he was able to perform his duties as a fire policeman on a substantial and regular basis. The record reflects he missed few calls to fires and few meetings of the company. He also contributed his time and skills to improving the firehall by panelling and cabinet work. Quite clearly, the individual who was totally disabled from being a union carpenter after 1965 was completely capable of *186 functioning as a volunteer fireman from 1966 until the accident of 1970.
The court finds that plaintiff had a regular occupation as a fire policeman for 40 months prior to the accident, without compensation, that he was injured while on actual duty as an active member of the fire company, and that as a result of the injury he can no longer perform his duties as a fire policeman. This entitles him to the benefits of Benefit E of the policy until he is no longer incapacitated.
Judgment for plaintiff.