Lucian J. NORCIA, Plaintiff,

v.

The **EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES; Paul Revere Life Insurance Company; and Provident Companies, Inc.,** Defendants.

**No. Civ.A. 980192PHXRGS.**

United States District Court,
D. Arizona.

Jan. 19, 2000.

Calvin C Thur, Thur & O'Sullivan PC, Scottsdale, AZ, for Lucian J Norcia, plaintiff.

Pamela B Petersen, Lewis & Roca LLP, Phoenix, AZ, Stephen M Bressler, Lewis & Roca LLP, Phoenix, AZ, for Equitable Life Assurance Society of the United States, Paul Revere Life Insurance Company, Provident Companies, Inc., defendants.

*MEMORANDUM AND ORDER*
*FOR CERTIFICATION*

YOUNG, District Judge.[1]

## I. INTRODUCTION

"The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else." Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv.L.Rev. 457,

1. Of the District of Massachusetts, sitting by designation.

462 (1897). This "bad man" theory of contracts permeates American common law. That is, a contracting party usually cannot demand performance of a valid contract; rather, the defaulting party must either perform or pay damages equivalent to the value of the promised performance. Under this approach to contract theory, it follows that when performance becomes uneconomic, a contracting party will not infrequently break a contract, preferring instead to pay damages.

■ While this approach to contract law finds justification in efficient economic theory, it tends to break down in the realities of actual litigation when the "bad men" are major insurance companies such as the defendants here, Equitable Life Assurance Society of the United States ("Equitable"), Paul Revere Life Insurance Company ("Paul Revere"), and Provident Companies, Inc. ("Provident") (collectively "the Equitable companies"), exploiting their superior cash reserves and skill as institutional litigants against a lone, disabled individual, here Lucian J. Norcia ("Norcia"), in order to delay for as long as possible having to pay the damages to which Norcia is entitled. Recognizing the vast inequities in bargaining power in such situations, Arizona courts have created at common law a tort for "bad faith" denial of insurance claims, *Rawlings v. Apodaca,*

151 Ariz. 149, 156, 726 P.2d 565, 572 (1986), a tort that carries with it the potential for an award of punitive damages against the offending insurance company. *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986). The deceptively simple question at the heart of this case is thus whether the conduct of the "bad men" here—Equitable, Paul Revere, and Provident—though clearly "disgraceful" as this Court remarked at oral hearing on November 4, 1999—is so sufficiently noxious as to subject them to tortious, and possibly punitive, damages for denying Norcia's valid insurance claim.

## II. PRIOR PROCEEDINGS

Norcia commenced this action against Equitable, Paul Revere, and Provident for contract damages for breach of various insurance contracts, for tortious bad faith, and for punitive damages on December 24, 1997, in the Arizona Superior Court sitting in and for Maricopa County. Equitable promptly removed the case to the District of Arizona on February 3, 1998. If the Equitable companies were seeking delay by this maneuver,[2] they were sorely disappointed. Norcia moved for summary judgment as to the defendants' contract liability with commendable promptness and Judge Strand granted the motion in no uncertain terms on February 16, 1999.

---

**2.** "There is a huge problem with our border courts. They are overwhelmed." Karen Redmond, a spokeswoman for the Administrative Office of the U.S. Courts in Washington, as quoted in Shelley Murphy, *Court Screenings Video Lets Judge Preside from Afar,* Boston Globe, Dec. 9, 1999, at B1. "Five southwest districts now handle 26 percent of all federal criminal filings in the United States, a statistic attributed mostly to the large number of drug trafficking and immigration cases currently in courts in states bordering Mexico." Border Courts Explore New Ways to Cope With Growing Workload, Federal Court Management Report 1 (1999).

Over three years ago, this Court said "the District of Arizona's docket is the tenth heaviest in the nation" and

There is no doubt but that the District of Arizona needs more judicial resources, and the Judicial Conference has requested two

additional judgeships for this district. Actually, in terms of "weighted" filings, Arizona stands seventh out of the 94 district courts in the number of cases assigned to each judge and 77th in the median time from filing to trial. Statistics Division, Administrative Office of the United States Courts, 1995 Federal Court Management Statistics 126 (May 1996) .... These rather stark statistics properly ought concern the people of Arizona if they are serious about trying cases in their home courts.

*Lexington Ins. Co. v. City of Phoenix,* CIV.A. No. 96–10319–WGY, 1996 WL 463672, at *1 n. 3. (D.Mass. July 31, 1996). *But see* 2000 Judiciary Appropriations Act, Pub.L. No. 106–113, 113 Stat. 1501 (1999) (providing three new district court judgeships for the District of Arizona). It is to be hoped these new judges—so sorely needed—will be promptly nominated and confirmed.

Equitable then proceeded to pay the requisite insurance benefits for the period from December 6, 1997 through February 6, 1999.[3]

While Equitable, Paul Revere, and Provident are thus starkly revealed as the proverbial "bad men," they here move for partial summary judgment on the tort and punitive damages claims arguing that, while they may have misinterpreted Arizona law, they did not act in bad faith in denying Norcia's claim.

## III. STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. The moving party need not disprove matters on which the opponent has the burden of proof at trial. *See id.* Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548; *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir.1994). "Conclusory allegations unsupported by factual data are insufficient to defeat a motion for summary judgment." *Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1237 (9th Cir.1998).

The Court proceeds to set forth the undisputed facts, drawing all inferences against Equitable, Paul Revere, and Provident. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).

## IV. UNDISPUTED FACTUAL BACKGROUND

Norcia purchased three separate Equitable disability policies, one in 1979, another in 1983, and a third in 1988. The 1979 policy provides lifetime benefits for total disability due to accident and benefits to age 65 for total disability due to sickness. The policy defines total disability as:

[T]he complete inability of the Insured, because of injury or sickness, to engage in the Insured's regular occupation, except that after twenty-four months of continuous total disability, total disability shall then mean the complete inability of the Insured to engage in any occupation for which the Insured is reasonably fitted by education, training or experience, provided, however, that total disability will not be considered to exist for any period during which the Insured is not under the regular care and attendance of a physician, except in the cases of presumptive total disability.

(Defs.' Statement of Facts Ex. A.) The 1983 policy provides lifetime benefits for total disability due to accident and total disability due to sickness occurring before the age of 50, and benefits to age 65 for total disability due to sickness occurring at age 50 or later. The policy uses exactly the same language as the 1979 policy to define total disability. (*Id.*) The 1988 policy provides lifetime benefits for total disability due to accident and total disability due to sickness occurring before age 60 and benefits to age 65 for sickness total disability occurring at age 60 or later. The policy defines total disability as:

[Y]our inability due to injury or sickness to engage in the substantial and material duties of your regular occupation. But after such disability has lasted continuously for 120 months past the end of the Elimination Period, or until age 55, whichever is later, it will mean your inability to engage in the substantial and material duties of any occupation for which your education, training or experi-

---

**3.** Equitable did not, however, pay the man-

dated interest until April 8, 1999.

ence reasonably qualifies you. It will not be considered to exist for any time you are not under the regular care and attendance of a doctor."

(*Id.*) The 1988 policy further defines regular occupation as the one "in which you are regularly engaged for gain or profit at the time you become disabled." (*Id.*)

Norcia was the owner and manager of Airport Limousine Express in New Jersey from 1983–1991. In April 1991, Norcia was diagnosed with Hepatitis C and submitted his first claim for disability benefits. Norcia was unable to perform his duties of dispatching, driving and marketing due to the medication he was taking for Hepatitis C. After Equitable denied the claim, Norcia filed a lawsuit, which was settled in April 1994 for $10,000. The release signed by Norcia absolved Equitable from "all claims for any disability prior to October 29, 1993." (Pl.'s Statement of Facts App. 7.)

In the latter part of 1991, Norcia moved to Arizona and no longer managed Airport Limousine Express. In late 1992, Norcia worked for two weeks at Ambu–Vans in Tucson, Arizona. (*See* Pl.'s Statement of Facts App. 70 at 42.) In September or October of 1992, Norcia opened a boutique antique store, Arizona Southwest Association, on Main Street in Apache Junction. (*See id.* at 43.) In February 1994, Nor-

cia's health forced him to close the store and, as a result, he never earned back the principal he put into the business. (*See id.*) Norcia went back to New Jersey in 1992 to attend his father's funeral, but did not do any work for Airport Limousine Express. (*See id.* at 54). In addition, Norcia went back to New Jersey in 1993 to sell his ownership in Airport Limousine Express. (*See id.*)

In 1991 Norcia had no reported income, but in 1992 Norcia reported W–2 wages from Airport Limousine Express in the amount of $28,600.[4] (*See* Defs.' Statement of Facts Ex. E at 9.) In 1993, Norcia received $7,500 from Airport Limousine Express and $232.50 from Ambu–Vans.[5] (*See id.* at 17–18.) In addition, Norcia filed for unemployment in Essex County, New Jersey, from April 18, 1993 until December 4, 1993 and collected $10,725. (*See id.* at 19.)

On October 23, 1993, Norcia was in a horseback riding accident and received a vertebral compression fracture and ten fractured ribs. Norcia filled out a second claim form on December 8, 1993, and listed his occupation immediately before he became disabled as "semi-retired—was collecting unemployment." (Defs.' Statement of Facts Ex. B at 6).[6] Equitable paid benefits on Norcia's claim from November 28, 1993 until February 21, 1994. Equita-

---

4. There is a dispute concerning this $28,600. Norcia claims that the $28,600 was a distribution paid to him by Airport Limousine Express in 1992 and not money that he received as a result of working at the business. Norcia also claims that his wife, Carol, received a similar distribution of $24,650. The Equitable companies claim, on the other hand, that money reported on a W–2 is presumed to be payment for services rendered, because if the payment was a distribution, the company would have had to report the payment on a form 1099–DIV. For the purpose of this summary judgment motion, the Court necessarily resolves this dispute in Norcia's favor. It is undisputed, however, that the sum of $28,600 was reported as W–2 wage income for Norcia in 1992.

5. The $7,500 in wages reported on Norcia's 1993 W–2 from Airport Limousine Express is also a matter of dispute. Again, Norcia

claims that this was a distribution and the Equitable companies claim this is presumed to be for services rendered. Further, the Equitable companies cite a September 30, 1997 letter from Norcia to Equitable where he states "I was gainfully employed up to the period of the accident claim [October 1993]. This employment included consulting work performed for Airport Limousine Express...." (Defs.' Statement of Facts Ex. C at 10).

6. The parties dispute *when* Norcia actually informed Equitable that he had been employed at the time of the fall. Norcia claims that he provided Peter Hollander with the necessary paperwork to establish his self-employment at Arizona Southwest Association at the time his claim was being handled. The Equitable companies argue that the first time they knew of Norcia's claim of self-employ-

ble terminated Norcia's benefits because his last visit to Dr. Wilson was on January 24, 1994, and he was thereafter no longer under the care of a licensed physician.[7]

In March 1994, Norcia was diagnosed with kidney stones. On April 15, Norcia met with an Equitable representative and informed him that on April 5, 1994, he had been hospitalized and treated for kidney stones. Equitable told Norcia that he would have to submit a new claim form because kidney stones were considered a sickness and not an accident and would be subject to a new 30–day elimination period.[8] On April 29, 1994, Norcia submitted his claim, and Equitable paid him $2,533.34 in benefits from April 17, 1994 until May 24, 1994. According to the attending physician's report, Norcia was able to report to work on May 25, 1994. (Defs.' Statement of Facts Ex. G at 5.) Norcia listed his occupation immediately before becoming disabled as "unemployed at the time."[9] (Defs.' Statement of Facts Ex. B at 10.)

After he began treatment with Dr. Wayne Broky, Norcia resubmitted his third claim on July 1, 1994. Norcia listed his occupation as self employed, earning $2,000 per month, and stated that he had back pain prolonged by a series of problems in the past year including an auto accident in February 1993, the horseback riding fall in October 1993, and the kidney stones in March 1994. Norcia described the duties of his occupation as the ability to drive and sit and move without restriction. On November 1, 1994, Dr. Broky certified Norcia as permanently disabled due to a combination of problems identified as vertebral compression fracture (thoracic), cervical spondylosis, chronic pain, renal stones, fractured ribs, osteopenia, hypertension and chronic hepatitis. As a result of this diagnosis, Equitable resumed payment of benefits in November, 1994, and continued them until December 5, 1996.[10]

ment was in his letter to Anthony Wilson, an Equitable claims representative, on September 30, 1997. The Equitable companies point out that Norcia told an Equitable claims representative that he was not working at the time of the fall, and in fact had not worked since moving to Arizona. (*See* Defs.' Statement of Facts Ex. C at 7.) Moreover, no tax returns were filed for any Arizona business in 1992, 1993, or 1994, and Norcia told one of his treating physicians in October, 1994, that "[h]e is retired. He was a chauffeur. Subsequently added (sic) his own business in New York and New Jersey and moved out here to retire a couple of years ago." (Defs.' Statement of Facts Ex. C at 18.)

For the purposes of this motion, the Court assumes Norcia's version to be correct.

7. Norcia claims that this termination was improper because he was under the continuous care of many licensed physicians for, among other things, Hepatitis C. The Equitable companies argue that Dr. Wilson examined Norcia and stated that Norcia could likely be cleared to work in mid-February. (*See* Defs.' Statement of Facts Ex. G at 1.) Moreover, the Equitable companies argue that by March 1994, Dr. Antonio Higuera learned that Norcia was once again horseback riding. (*See id.* at 2.)

Again, for the purposes of the summary judgment record, this Court assumes the facts

as stated by Norcia without here drawing the legal conclusion that the termination was improper.

8. Norcia argues that by classifying this as a third claim, Equitable eliminated lifetime benefits under two of his disability policies. Also, Norcia argues that Equitable refused to acknowledge his continuing disability resulting from Hepatitis C and the fractures of the vertebrae and ribs.

9. Norcia argues that claim examiner, Peter Hollander, completed part of a claim department form regarding the second and third claims which ask for occupation by stating: "Occupation At Claim Time: Limo Owner." (Pl.'s Statement of Facts App. 48.)

10. Equitable claims that it resumed benefit payments under a reservation of rights due to its belief that Norcia was unemployed at the time he became disabled and that Norcia could perform the usual activities of an unemployed or retired person. This is contested by Norcia, and is unclear. The letter referred to by the Equitable companies does not explicitly state that Equitable reserved its rights. (*See* Defs.' Statement of Facts Ex. H at 5.) Norcia submits that Equitable paid benefits without any reservation of rights until April 8, 1996. (*See* Defs.' Statement of Facts Ex. H at 6.)

On January 6, 1995, the Equitable companies wrote to Dr. Broky asking if Norcia's conditions prevented him from performing the daily activities of a retired person. Dr. Broky replied that a retired individual need not lead a sedentary existence. Equitable responded by saying that it considered Norcia to be retired and asked if Norcia was restricted from standing, sitting, walking, and driving. Dr. Broky replied that Norcia was permanently and totally disabled because of his health conditions but was not restricted from doing those four activities.

On April 8, 1996, Equitable claim examiner, Anthony Willson, sent a letter to Norcia that stated "[t]hese benefits have been paid on a good faith basis, and we are currently reviewing the status of your claim. We retain all rights and defenses afforded us in the contract." (Defs.' Statement of Facts Ex. G at 6.) In response to an April 8, 1996 referral letter sent by Willson to a superior, John O'Hara, O'Hara stated that he expressed concern that no action had been taken with respect to Dr. Broky's confirmation that Norcia could perform a sedentary occupation. (*See* Pl.'s Statement of Facts Ex. 60 at Bates CFA0462.)

On September 25, Equitable called Dr. Broky and asked if Norcia remained unrestricted in daily living such as standing, sitting, walking, and driving. Dr. Broky responded that Norcia's condition remained the same, i.e., he remained unrestricted in these activities, but was still considered permanently and totally disabled. As a result, Equitable terminated Norcia's benefits effective December 5, 1996.

In January 1997, however, Equitable notified Norcia that they were going to re-open his claim on a good faith basis and pay with reservation of rights until February 6, 1997. In addition, based on Dr. Broky's determination that Norcia was disabled for the unpaid periods between May and October 1994, on July 1, 1997 Willson sent Norcia a letter stating that Equitable would pay him benefits for that period.

In June 1993, Equitable had entered into an agreement with Paul Revere for Paul Revere to handle Equitable's disability claims. According to the agreement, Paul Revere received "incentive fees" for terminating Equitable's benefit payments. The greater the number of benefit payments that were reduced or claims terminated, the more Paul Revere and Equitable profited.[11] In March 1997, Provident

11. Norcia's and the Equitable companies' experts differ in their characterization of this agreement. Norcia's expert, Mark Reiser, stated in his disclosure that "[i]n summary, for all Agreement Years, The Paul Revere Life Insurance Company would have increased the Incentive Fee that it received by denying claims.... Furthermore, The Paul Revere Life Insurance Company would have increased the Incentive Fee that it received by denying as many claims as possible as early as possible." (Pl.'s Supplemental Expert Disclosure Re Expert Mark Reiser.) Reiser reached an identical conclusion regarding the Administration Agreement for Existing Business Dated April 6, 1999 between Provident, Paul Revere, and Equitable. (*See* Pl.'s Notice of Service of Supplemental Expert Disclosure Statement.)

The Equitable companies' expert, David Childers, argued that the incentive fees were based on an annual experience gain or loss compared to certain benchmark loss ratios agreed upon by the parties. (*See* Defs.' Supplemental Expert Disclosure at 4). Therefore, while the Agreement encouraged Paul Revere to manage the claims in a responsible manner, it did not provide an incentive to deny Norcia's claim. Childers also claimed that nothing in the record suggested that individual claims adjusters or others involved in the administration of the claims were aware of the incentive fee provisions. Further, Childers argued that the agreement was reviewed by the New York Department of Insurance, and they did not find the incentive fee provisions in the agreement to be objectionable. Moreover, the Equitable companies asserted that no incentive fees were paid to Paul Revere for the years 1993–1997, the entire time Norcia's claims were pending. (*See* Stephen Rutledge Aff.; Defs.' Supplemental Statement of Facts Ex. I.) Norcia counters that the only reason incentive fees were not paid Paul Revere is because, despite its best efforts to dump claims, it never reached the required benchmarks. (*See* Pl.'s Second Supplemental Response.)

There are no genuine issues of material fact with respect to these written agreements.

bought Paul Revere and took over the handling of Norcia's claim and terminated his benefits.

On September 2, 1997, Dr. Goldstein, an employee of Provident, performed a functional capacity evaluation ("FCE") on Norcia.[12] (*See* Defs.' Statement of Facts Ex. G at 11–17.) The FCE report stated that Norcia was able to perform all activities of daily living within his lifting restriction of ten pounds. On December 18, 1997, Joe Mauvais ("Mauvais"), a Provident field representative, delivered Norcia notice of the final termination decision. During this visit, Mauvais said to Norcia:

> "[T]o qualify for benefits there needs to be.... I mean basically, you have to be unable to perform the everyday activities of living. I mean, you've gotta be basically bedridden. Uh, you know, you can't ... you can't take care of your personal hygiene. You can't cook, you can't dress yourself, shower or shave—those types of things."

(Pl.'s Statement of Facts App. 28 at 7.) This meeting was followed up with a letter on January 8, 1998, which stated "we consider your occupation at time of claim to be that of a retired/unemployed person.... [T]he results of the Functional Capacities Assessment you underwent in September 1997 were that you are capable of performing the activities of daily living. As such, you are no longer considered to be totally disabled under the terms of the contracts." (Defs.' Statement of Facts Ex. H at 12.)

The trouble with Mauvais' homespun analysis and the pseudo-legalities of the letter of January 8, 1998, is that both are "pure poppycock," [13] utterly bereft either of textual support in the language of the insurance contract or the gloss placed on

such language by any Arizona case. Judge Strand thus made short work of the Equitable companies' defense as to liability.

### A. Bad Faith Claim.

■ To show a claim for bad faith, a "plaintiff must show the absence of a reasonable basis for denying [the] benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Tobel v. Travelers Ins.*, 988 P.2d 148, 156 (Ariz.App.1999) (quoting *Noble v. National Amer. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 [1981] ); *See also Rawlings*, 151 Ariz. at 156, 726 P.2d at 572. Thus, the tort will not lie for claims which are "fairly debatable." *Lasma Corp. v. Monarch Ins. Co.*, 159 Ariz. 59, 63, 764 P.2d 1118, 1122 (1988) (quoting *Noble*, 128 Ariz. at 190, 624 P.2d at 868). "Whether the insurer ultimately loses its dispute with the insured is not important to the resolution of the bad faith issue. Even if ultimately wrong, if a reasonable basis existed for denying the claim, the insurer cannot be liable for bad faith." *Aetna Cas. and Sur. Co. v. Superior Court*, 161 Ariz. 437, 440, 778 P.2d 1333, 1336 (1989). Therefore, even though Judge Strand determined that the status of being "unemployed" or "retired" can never be considered a regular occupation under any circumstances, it does not follow *a fortiori* that the Equitable companies' termination of benefits was done in bad faith.

The key legal question before this Court is whether the Equitable companies had a reasonable basis for classifying Norcia's regular "occupation" as "unemployed" or "retired" for the purpose of terminating

---

The Court draws the inferences in the text for the purposes of this motion as they are both appropriate and weigh against granting summary judgment.

12. Norcia argues that with all the medical records and investigation reports that Defendants had at that point, it was apparent that no independent medical doctor would ever declare Norcia anything but totally disabled.

Norcia argues, therefore, that the FCE was done because it could be manipulated and restricted only to questions which the Defendants wanted answered.

13. The phrase is that of my distinguished colleague Walter J. Skinner. Unfairly treated in Jonathan Haar's *A Civil Action*, Judge Skinner is one of the nation's foremost jurists.

the benefits on his third claim. Arizona court decisions are silent on this point.

Stretching, the Equitable companies do, however, find a single lower court decision that reads the term "occupation" as broadly as they need to support their interpretation.[14] *Ohrel v. Continental Cas. Co.,* 138 N.J.Super. 170, 187, 350 A.2d 310, 317 (1975).

In *Ohrel,* the Superior Court of New Jersey interpreted "occupation" to mean "the way an individual primarily occupies his time: the principle activity of one's life. While an occupation may be followed for the sake of money, it is not essential to do so." *Ohrel,* 138 N.J.Super. at 182, 350 A.2d at 317. Thus, if "fairly debatable" can be read so broadly as to encompass any legal point that is "debatable" after exhaustive, *post hoc* nationwide research, even though the contracting parties never considered it and acted out of pure self interest, then Norcia's present tort claim will not lie. No Arizona court decision considers the temporal nature of the "fairly debatable" issue. That is, must an insurer have considered and researched the legal landscape before engaging in terminating insureds or will a *post hoc* rationalization suffice?

■ Citing many internal Provident memos addressing the need to increase claim terminations and denials, Norcia argues at great length that the Equitable companies engaged in a claim termination scheme in order to increase profits. The Incentive Fee provisions of the 1993 agreement between Equitable and Paul Revere and the subsequent Administration Agreement between Provident and Equitable are said to be further evidence of this scheme. Recently, however, the Arizona Court of Appeals held that if a claim is fairly debatable, the insurer is entitled to judgment in its favor even if there is evidence that it engages in questionable claims practices. *See Zilisch v. State Farm Mut. Auto. Ins. Co.,* 194 Ariz. 34, 977 P.2d 134, 139 (Ariz. App.1998) (further review pending before the Arizona Supreme Court).

*Zilisch* held that the Arizona cases which discuss fair debatability "assume that if the claim is fairly debatable, all inquiry ends." *Id.* at 140. Otherwise, "every claim, no matter how illfounded, against any insurance company that might have engaged in generalized improper claims practices would become a bad faith claim." *Id.* The Court asserts that this is not good policy, reasoning that "[i]f we were to find that an action in bad faith can proceed on a claim that is fairly debatable as a matter of law, we would be doing so based on the insurer's subjective motive.... Subjective motive is only important if the insurer fabricates evidence to create fair debatability or relies solely on contradicted facts which it alone generates." *Id.*

It is hard to overstate the importance of *Zilisch* to the resolution of the present case. If it is good law—the further appeal was recently argued before the Arizona Supreme Court—and if the Equitable companies can rely upon a *post hoc* rationalization, then they are entitled to summary judgment on the bad faith tort claim. Otherwise, this claim is a matter for jury resolution.[15]

---

14. There is not a scintilla of evidence in the present record to support the conclusion that anyone in the Equitable companies had ever heard of *Ohrel* before they got into the present imbroglio with Norcia and their attorneys began to scramble to avoid liability for his termination of benefits. This Court thus infers, as it must on the summary judgment record, that the Equitable companies cut Norcia off without knowledge of any legal support for that insurance contract interpretation.

15. There is apparently conflicting case law in Arizona regarding whether the issue of "fairly debatable" is properly for a jury. In *Sparks v. Republic Nat'l Life Ins. Co.,* 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (1982), the Court held that "the question whether a claim is fairly debatable is for the jury to decide." In *Zilisch,* however, the Court of Appeals stated that "in a number of cases, however, the question has been decided by the [Supreme] [C]ourt [of Arizona] as a matter of law" since "[n]o Arizona case offers clear guidance as to when it is proper to submit such a case to the jury." *Zilisch,* 977 P.2d at 137.

*Sparks* and *Zilisch* are not actually in conflict. when questions of fact which must be

## B. *Punitive Damages.*

It is well settled in Arizona that "[s]omething more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or malice or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton."

*Rawlings,* 151 Ariz. at 162, 726 P.2d at 578. Further,

"plaintiff must prove that defendant's evil hand was guided by an evil mind. The evil mind which will justify the imposition of punitive damages may be manifested in either of two ways. It may be found where the defendant intended to injure the plaintiff. It may also be found where, although not intending to cause injury, defendant consciously pursued a course of action knowing that it created a substantial risk of significant harm to others."

*Id.* Finally, "[i]t has been stated that action justifying the award of punitive damages is 'conduct involving some element of outrage similar to that usually found in crime.' " *Id.* (quoting Restatement [Second] of Torts § 908 cmt b). Therefore, as *Norcia* conceded candidly at oral argument, if the bad faith tort claim founders, the claim for punitive damages collapses as well.[16]

## V. CERTIFICATION

The Arizona Supreme Court has already recognized the importance of *Zilisch* by granting it further appellate review. Because the issues there presented compliment so well the issues proffered here and because resolution of that appeal will affect, but may not determine, the outcome of the present case, this Court has determined pursuant to Ariz.St.S.Ct.R. 27, to certify to the Supreme Court of Arizona the questions of law set forth below:

1. Upon the present record and in the context of the present case, can the word "occupation" in the insurance contract at issue here be read so broadly as matter of law as to encompass one who is "unemployed" or "retired?"

2. In order for an issue to be "fairly debatable" in defense to a bad faith insurance handling claim, must the legal authority upon which the insurance company bases its defense have been known to it at the time it takes action?

3. If not resolved by the Arizona Supreme Court's decision in *Zilisch,* are generalized improper claims-handling practices legally relevant to a specific case if the resolution adopted by the insurance

---

resolved by juries are not actually disputed, summary judgment as matter of law is appropriate. Here, however, unless the Equitable companies can rely upon their later discovery of the *Ohrel* decision, the issue of their alleged bad faith is manifestly one for jury resolution. The confidence of the Court in reaching this result is confirmed by the fact that Arizona is the nation's recognized leader in vitalizing its jury system. *See e.g.,* Ariz.R.Civ.P. 39 and apps. 8, 14 to G; Thomas Munsterman, Paula L. Hannaford, & G. Marc Whitehead, *Jury Trial Innovations* (ABA 1997). Absent *Ohrel* and *Zilisch,* this Court concludes Arizona would try this case to a jury.

16. Although no party cites any facts from which one could conclude that the following cases present records factually similar to the case at bar, for completeness it is perhaps worth noting that the Equitable companies appear to be having problems in Arizona stemming from their claims-handling practices. *See Wengel v. Provident Life and Accident Co.,* CA No. 97–774–TUC–WGN (D.Ariz. Nov. 16, 1999) (Nielsen, J.) (order denying motion for directed verdict as to bad faith claims-handling practices but allowing such motion as to punitive damages); *McKendry v. Paul Revere Life Ins. Co.,* CA No. 96–754–PGR (D.Ariz. June 7, 1999) (Rosenblatt, J.) (after denial of motion for directed verdict on bad faith claims-handling practices and punitive damages, judgment upon jury verdict against Paul Revere enters in the amount of $6,6000,-000 punitive damages [docket nos. 188 and 197] ). *See generally Diamond v. General Am. Life Ins. Co.,* CA No. 96–02277 (Arizona Superior Ct., October 5, 1999) (Sheldon, J.) (order approving punitive damages award of $18,-000,000).

company in that specific case is "fairly debatable" as matter of law without regard to those practices?

The Clerk will forward a certified copy of this Memorandum and Order for Certification, together with the complete summary judgment record, to the Clerk of the Supreme Court of Arizona. This case is administratively closed until the Supreme Court of Arizona issues its opinion herein.